## APPEAL OF COBURN HEIRS, INC.

Docket No. 1131. Promulgated June 16, 1927.

1. The aggregate of unit prices for stumpage or merchantable timber *held* not to represent the value of an entire tract of timber in computing depletion.

2. A valuation of exhaustible property such as timber based upon future income must recognize the discount applicable to such income.

3. The statement that the Commissioner's valuation of timberland used in determining depletion was based upon information in his files which he was forbidden to disclose in a public proceeding is entitled to no weight as evidence of value.

4. The value on March 1, 1913, of timber located on two tracts in Maine determined in the light of all the numerous facts and circumstances in evidence.

*William R. Pattangall, Esq.*, and *Carter B. Keene, Esq.*, for the petitioner.

*Ward Loveless, Esq.*, and *Benjamin H. Saunders, Esq.*, for the Commissioner.

Deficiencies in income and profits taxes for the years 1919 and 1920, aggregating $7,909.67, resulting from the Commissioner's re-

duction of the petitioner's deductions for timber depletion. The issue for determination is the fair market value on March 1, 1913, of two certain timber tracts in Maine.

FINDINGS OF FACT.

Petitioner, a Maine corporation with its principal office at Skowhegan, was organized in May, 1911, for the purpose of taking over and holding certain timberlands located in the Kennebec Valley in Maine and selling timber under stumpage permits.

In 1919 the Coburn estate owned approximately 200,000 acres of timberlands. Differences arose between the two groups of heirs as to the proper business policies and management of the estate, and a division of the properties was agreed upon. The tracts were listed and each group made a sealed bid, a give or take offer, on each separate tract of timber. The amount thus bid was the price at which the bidder was willing to buy or to have the other group pay for the tract. Only one bid was opened on each piece of property. Neither group knew, prior to the actual opening of the bid, just when a bid upon a particular piece of property would be reached, nor which group's bid would be opened. As each bid was drawn the adverse group had the choice of buying or selling at the price bid. It was desired that after the division of the properties had been completed the holdings of the two groups, as represented either by the value of the properties which each acquired or the equivalent thereof in cash, should be in direct proportion to their respective interests in the estate; so that it was agreed that any adjustment necessary should be made by the payment of cash. The group of heirs who subsequently incorporated as the Coburn Heirs, Inc., the petitioner in this proceeding, and who owned approximately a 56 per cent interest in the estate, secured about 120,000 acres of timberland at a total auction price of $1,143,825. The other group of heirs, subsequently organized as a Massachusetts trust known as the Coburn Lands Trust, who owned approximately a 44 per cent interest in the estate, secured about 80,000 acres of timberlands at a total auction price of $871,-787. The adjustment to maintain the proportionate interests of the two groups was effected through the payment of $25,000 cash to the Coburn Lands Trust group by the Coburn Heirs group.

Among the tracts purchased by the Coburn Heirs group were the Jackman tract and a 41/128ths interest in the Spencer Bay tract involved in this proceeding. The Jackman tract was purchased on a Coburn Lands Trust group bid of $80,000. The 41/128ths interest in the Spencer Bay tract was purchased on a Coburn Heirs group bid of $46,000. The bid of the Coburn Lands Trust group for the

Spencer Bay tract, if opened, would have been $25,000. These tracts were owned by the petitioner on March 1, 1913, and during the years in controversy.

Jackman is a tract of 10,726 acres, of which, on March 1, 1913, 9,716 were covered by merchantable timber and young growth (timber not yet merchantable). The petitioner on its return claimed a fair market value for this property as of March 1, 1913, of $365,719. The Commissioner allowed a value of $131,926.

The fair market value on March 1, 1913, was as follows:

*Jackman*

| Specie | Quantity | Value per M feet | Total |
|--------|----------|------------------|-------|
| Spruce saw logs_____feet__ | 15,000,000 | $4 | $60,000 |
| Spruce pulp wood_____do____ | 10,700,000 | 3 | 32,100 |
| Pine_____do____ | 1,200,000 | 4 | 4,800 |
| Fir_____do____ | 5,700,000 | 3 | 17,100 |
| Cedar_____do____ | 1,900,000 | 3 | 5,700 |
| Hemlock_____do____ | 750,000 | 2 | 1,500 |
| Yellow birch_____do____ | 8,000,000 | | |
| White birch_____do____ | 400,000 | | |
| Hard maple_____do____ | 2,350,000 | 1 | 11,450 |
| Beech_____do____ | 700,000 | | |
| Poplar_____do____ | 1,500,000 | 2 | 3,000 |
| Land_____acres__ | 10,726 | 1 | 10,726 |
| Young growth_____do____ | 9,716 | 1 | 9,716 |
| Total value_____ | | | 156,092 |

Spencer Bay is a tract of 11,161 acres, of which 9,164 were covered by merchantable timber and young growth on March 1, 1913. The interest in this tract owned by the petitioner was a 41/128ths undivided interest in the whole. The petitioner claimed a fair market value for a 100 per cent interest in the whole tract, as of March 1, 1913, of $266,922. The Commissioner allowed a value of $140,061.

The fair market value on March 1, 1913, was as follows:

*Spencer Bay*

| Specie | Quantity | Value per M feet | Total |
|--------|----------|------------------|-------|
| Spruce saw logs_____feet__ | 10,000,000 | $5 | $50,000 |
| Spruce pulp wood_____do____ | 11,000,000 | 4 | 44,000 |
| Pine_____do____ | 3,000,000 | 5 | 15,000 |
| Fir saw logs_____do____ | 1,250,000 | 4 | 5,000 |
| Fir pulp wood_____do____ | 1,000,000 | 2 | 2,000 |
| Cedar_____do____ | 3,000,000 | 4 | 12,000 |
| Hemlock_____do____ | 500,000 | 2 | 1,000 |
| Yellow birch_____do____ | 8,000,000 | | |
| White birch_____do____ | 2,500,000 | | |
| Hard maple_____do____ | 1,750,000 | 1 | 13,750 |
| Beech_____do____ | 1,500,000 | | |
| Poplar_____do____ | 1,000,000 | 2 | 2,000 |
| Land_____acres__ | 11,161 | 1 | 11,161 |
| Young growth_____do____ | 9,164 | 1 | 9,164 |
| | | | 165,025 |

The value of petitioner's interest at March 1, 1913, was 41/128 × $165,025 = $52,860.

No separate valuation on hardwoods was made by the Commissioner either by species or tracts, but a lump sum was allowed to cover the hardwoods on all the petitioner's properties.

In its return the petitioner claimed depletion deductions of $71,655.37 for the year 1919, and $75,732.35 for the year 1920. The Commissioner determined the total March 1, 1913, value of all of petitioner's timber properties to be $1,400,000, and since this amount is 47 per cent of the total March 1, 1913, value claimed by the petitioner, he has allowed as deductions 47 per cent of the amounts claimed by the petitioner for depletion, or $33,678.02 for 1919 and $35,594.20 for 1920.

The petitioner claimed depletion based on a March 1, 1913, value of the Spencer Bay tract based on ownership of 58.98 per centum interest, whereas it owned only a 41/128ths or 32.03 per centum interest on that date.

An additional interest of 77/288ths (or 26.736 per centum) was purchased in 1919 for $44,790, making a total ownership of 58.766 per centum. The total timber acquired by this purchase was approximately 10,069,110 feet as reflected by the timber remaining after deducting timber cut from the estimate at March 1, 1913. This cost is apportioned as follows:

| Specie | Allocation | Rate per M. | Specie | Allocation | Rate per M. |
|---|---|---|---|---|---|
| Spruce saw logs | } $25, 479. 08 | $5. 666 | Yellow birch | } $4, 793. 56 | 1. 304 |
| Spruce pulp logs | | | White birch | | |
| Pine | 4, 687. 30 | 6. 518 | Hard maple | | |
| Fir saw logs | 1, 255. 46 | 5. 215 | Beech | | |
| Fir pulp logs | 696. 60 | 2. 61 | Poplar | 696. 60 | 2. 605 |
| Cedar | 1, 397. 14 | 5. 216 | Land ($1 an acre) | 2, 984. 00 | |
| Hemlock | 350. 26 | 2. 62 | Young growth ($1 an acre) | 2, 450. 00 | |

OPINION.

STERNHAGEN: The deficiencies arise from the Commissioner's disallowance of a substantial part of the deductions taken by the petitioner for timber depletion. The parties are agreed as to the quantity cut in the years in question and as to the approximate quantities owned on March 1, 1913; and this leaves the value on that date of the quantities owned as the only matter to be determined. This issue is further narrowed because the parties have confined the dispute to the value of the timber on the tract of 10,726 acres in Jackman township and the petitioner's undivided interest of 41/128ths in the tract of 11,161 acres in the township of Spencer Bay.

As to these valuations the parties are far apart, not only as to the amounts of value but also as to the methods by which such valuations should be made and the data which may or should be considered. The petitioner's contention is that the Commissioner's method does not take into consideration or make allowance for unusual conditions existing in the timber market in Maine. It contends there is no regular market for timberlands; that those owning such lands are holding them and selling them only when circumstances compel them to do so; that even such sales are few; and that the prices so obtained are consequently not indicative of the true value. Its theory is that the fair market value is best obtained, under such circumstances, by ascribing to each unit of value in the property an amount representing or approximating the price which would be obtained for that unit if sold about March 1, 1913, and then adding these unit values to arrive at the total value of the property as a whole. Specifically, it claims a value for the property equivalent to the price which could be obtained for the merchantable timber if it were to be sold on a stumpage or permit basis, plus a value for the soil equivalent to the price which could be obtained for cut-over land with young growth thereon. The values thus claimed are $365,719 for Jackman and $266,922 for a 100 per cent interest in Spencer Bay. The Commissioner held these values to be too high, and, claiming to act in accordance with information in his files which he was forbidden to disclose in a public proceeding, and upon the special experience of a valuation expert, found that a so-called *en bloc* or wholesale value of each tract was between 40 and 60 per cent of the so-called retail value used by the petitioner. The values thus determined by the Commissioner are $131,926 for Jackman and $140,061 for a 100 per cent interest in Spencer Bay. As indicative of the fairness of the values which he has fixed, the Commissioner points to the prices at which the petitioner secured these properties in the division between the two groups of heirs in 1910, the action of the petitioner's board of directors in voting, on March 29, 1912, to give to a prospective purchaser of its entire timber properties an option to purchase at $15 per acre, and the sale by the petitioner, in 1914, of a tract of timberland in Holden township said to be comparable to Jackman and Spencer Bay tracts.

At the outset it should be said that we have given consideration to the entire evidence and have excluded nothing. Depositions of numerous witnesses to substantial length have been taken. The testimony in some of these has but a remote significance. It has nevertheless been considered. We give no weight to the statement that the Commissioner's valuations were based upon information in his files which he was forbidden to disclose in a public proceeding.

The petitioner's valuation of its timber properties is based on the aggregate of stumpage or permit prices for merchantable timber at March 1, 1913. We do not, under the circumstances in this case, believe that this represents the true value. Assuming that the prices claimed by petitioner are the actual prices prevailing at March 1, 1913, for timber to be removed under stumpage permits; and that the risks and burdens inherent in the ownership of property of this character, such as taxes, insurance, losses from fire, bug, wind, and storm, will be taken care of by future growth, as petitioner contends, the aggregate value claimed would be equivalent to the gross proceeds which the petitioner could on March 1, 1913, have expected to receive during future years. This fails to take into account the fact that the income from the sale of the timber through stumpage permits would only be realized over an extended period of years. At March 1, 1913, there were no operations of any consequence on the Jackman tract. The General Forest Industries Questionnaire which the petitioner filed with the Bureau of Internal Revenue shows that in the years 1913 to 1917, inclusive, only 208,000 feet of timber were removed from this tract. The first major operation apparently commenced during the logging season of 1917–1918. Operations had commenced on the Spencer Bay tract in the logging season of 1912–1913, under a stumpage permit. On March 1, 1913, Jackman had a timber stand of 48,200,000 feet and Spencer Bay a stand of 44,500,000 feet. At the close of the logging season of 1920–1921, or eight years later, but 25,334,495 feet, or approximately 52 per cent of the March 1, 1913, stand, had been cut from Jackman and at the close of the logging season of 1922–1923, or ten years later, but 15,798,313 feet, or approximately 36 per cent of the March 1, 1913, stand had been removed from the Spencer Bay tract. At these rates of cutting and removing the timber, it would have required approximately 16 years and 27 years, respectively, to cut and remove the timber from the Jackman and Spencer Bay tracts. Any method of valuation of exhaustible properties such as timber, based upon expected future income, which fails to give recognition to the principle of discounting such income, is obviously unsound. *Frances J. Eaton*, 5 B. T. A. 100. There are, of course, numerous other factors which should be considered.

The division of the properties between the two groups of heirs was made in 1910, and the prices are, therefore, not determinative of their values at March 1, 1913, approximately three years later. But they are a fair measure of value in 1910, and, if taken together with all of the other evidence, are helpful in determining the fair market value at March 1, 1913, of the properties in question. There were two adverse groups. Each held different views from the other as to proper

business policies and management of the estate. A division of the properties between the two groups appeared to be the only way out of the situation. Each group was called upon to place a price on each piece of property. Neither party knew whether it would be forced to buy or sell at its own price. The group later incorporated as the petitioner, and the group now known as the Coburn Lands Trust had approximately 60 per cent and 40 per cent interests, respectively, in the estate, and approximately three chances and two chances, respectively, out of five, to act upon each other's bid. Neither group knew just when a bid upon a particular piece of property would be reached, nor which group's bid would be opened and acted upon. Under the circumstances, if the bid of one group was too high, that group stood the chance of being forced to buy at its own high price, or if too low it stood the chance of being forced to sell a desirable piece of property at a low figure. Each group must have known that a separation of its interests from those of the other group and a division of the properties between the two would necessarily limit the income of each group thereafter to that derived from the properties which each secured in the division. If one group secured the most desirable properties its income thereafter would be enhanced while that of the other group would be adversely affected. Roy L. Marston, petitioner's treasurer and general manager, who represented the group which incorporated the petitioner company at the division, testified that the other group was in possession of all of the data which he had compiled after several years of investigation of all of the properties. Therefore it is apparent that the Coburn Lands Trust group was in a position to know the properties as well as the group which incorporated the petitioner company.

Furthermore there was the chance that one of the two groups might be required to make a substantial payment in cash to effect any adjustment necessary to maintain the proportionate interests of the two groups. The extent to which the Coburn Lands Trust group was influenced by this factor is indicated by the testimony of a witness who represented that group at the division. Upon cross-examination by counsel for the petitioner, he testified as follows:

Q. Assuming that your division resulted in your group retaining about the same percentage of ownership that it had in common and unidentified, so long as the price agreed upon for the various pieces of property were relative, it did not matter particularly whether they were full market value or not, did it?

A. Why, I did not feel that we were safe in taking any such view as that. Inasmuch as any balance must be paid in cash, it would be plain that if we inflated the values one hundred per cent, some one would make double the cash payment.

Q. And if you kept them fairly well down the cash payment would not be large?

A. But I would equally wish that cash balance to be fair, because at the time I did not know which one of us would pay it.

The division of the properties in 1910 was made between the parties as a business matter, and in our opinion the prices at which the properties in question were secured by the petitioner and the relation of those prices must be given due consideration in arriving at the fair market value of the properties at March 1, 1913.

The Commissioner put in evidence the minutes of a meeting of petitioner's board of directors held on March 29, 1912, which contains a resolution granting to one Northrop an option to purchase its entire timber holdings at the price of $15 per acre, subject to the approval of one Harry C. Turner. The option was never exercised.

The sale in 1914, upon which the Commissioner relies as tending to prove the values fixed by him, involved the transfer of a tract of 11,967 acres in Holden township, of which tract 11,632 acres were covered by merchantable timber and young growth. This tract was acquired by the petitioner in the 1910 division at a bid price of $263,000. It was sold by the petitioner for the sum of $375,000, of which $100,000 was paid in cash and the balance represented by notes. It is contiguous to Jackman on the north. The Spencer Bay tract lies some distance to the east of it, the two tracts being separated by four townships. All three tracts contained approximately the same acreage. Jackman and Holden were about equally accessible, and both were subject to full local taxation. Spencer Bay is not as accessible as Jackman and Holden, but it is subject to only a nominal tax.

Petitioner's witness, Marston, testified that the selling price of Holden was not a fair indication of its value or that of adjacent tracts; that the selling price was fixed at less than actual value in order to establish a large mill in the vicinity of Jackman which would be a market not only for timber owned by the petitioner, but for that of neighboring owners of timberlands, and which would give employment to people residing in Jackman; and that the selling price was fixed on the basis of $8 per thousand feet of spruce. There are, however, other facts to be considered in connection with the sale of Holden tract. In the General Forest Industries Questionnaire, for years prior to 1919, executed by the witness on behalf of the petitioner company, it is stated that the sale of Holden was made "in order to secure a large amount of money which was desired by a majority of the stockholders," and that "the price is actually what a willing buyer and a willing seller determined upon in 1913." It further appears from his testimony that the sales to the purchaser of this property, after the mill was established thereon, did not amount to more than a few hundred thousand feet, and that such sales as were made were of a casual nature. The spruce stand on Holden was

61,269,000 feet, and on the basis of $8 per thousand feet for the spruce, the selling price would have amounted to $490,152. The selling price was $375,000, which is equivalent to $6.12 per thousand feet of spruce; and if the selling price was based upon the spruce stand alone, it was undoubtedly not the actual value of the spruce but a composite figure intended to take in the value of the other 16,987,000 feet of soft woods and some quantity of hard woods, besides the young growth and soil.

Weighing all of the evidence bearing upon the sale of Holden, we think that the sale of this tract is indicative of the value of Jackman and Spencer Bay tracts, at March 1, 1913, if due consideration be given to the difference in the general characteristics of the three tracts. Counsel for the petitioner in their brief say that "it was a bona fide business sale near enough in point of date and character of property to be almost controlling as to values."

The comparison of Holden with Jackman and Spencer Bay tracts, for the purpose of determining the values of the two last mentioned, is made difficult because of lack of definite information as to the quantity of the hardwood stand on Holden. The record shows only the details of the softwood stand, although the evidence is clear that there were mature hard woods on the tract. However, there is evidence of the probabilities as to the hardwood stand.

Jackman is contiguous to Holden on the south, and the township of Thorndike, comprising 22,680 acres, of which 22,052 acres are covered with merchantable timber and young growth, which is also owned by the petitioner, is contiguous to Holden on the east. These two tracts, Jackman and Thorndike, form the boundaries of Holden on two sides. By comparison of the three tracts, the probabilities as to the hardwood stand on Holden can be fairly determined.

The Jackman and Thorndike tracts had approximately 26 per centum of hard woods. The Holden tract had a much heavier stand of soft woods than either of these tracts, which circumstance would presumably result in a lesser per centum stand of hard woods. Accordingly it is estimated that the Holden tract reasonably had 17 per centum of hard woods, or 16,000,000 board feet.

· Having available the quantities of soft woods from data contained in the Forest Industries Questionnaire, we can compute the amount which the Holden tract should have sold for at March 1, 1913, if the petitioner's unit rates were applied. This results in a total of $613,-179.50 for spruce, fir, cedar, and pine; adding to this an amount for hard woods estimated at $2 a thousand, gives $645,179.50.

Assuming a ratable increase from 1910 to 1914, and allocating $1 an acre to land and 50 cents an acre to young growth in 1910, and one dollar an acre to young growth in 1914, the March 1, 1913, value of the merchantable timber on the Holden tract woud be $324,850.

This value is approximately 50 per centum of $645,179.50, the amount previously computed. Therefore, from the evidence furnished by this sale, the fair market value at March 1, 1913, of timber *en bloc* in this district allocated to species, would be as follows:

|  | M board feet |
|---|---|
| Spruce saw logs | $4. 25 |
| Spruce pulp logs | 3. 50 |
| Fir saw logs | 3. 50 |
| Cedar | 3. 50 |
| Pine | 4. 25 |

The values per thousand board feet claimed by the petitioner and those allowed by the Commissioner as compared to these rates, are shown as follows:

|  | Claimed by petitioner | Allowed by Commissioner | Rates computed by Holden sale |
|---|---|---|---|
| Spruce saw logs | $7 to $8. 50 | $4 to $5 | $4. 25 |
| Spruce pulp logs | 5 to 7 | 3 to 4 | 3. 50 |
| Fir saw logs | 6 to 7 | 3 to 4 | 3. 50 |
| Cedar | 6 to 7 | 3 to 4 | 3. 50 |
| Pine | 7. 50 to 8. 50 | 4 to 5 | 4. 25 |

It is noted that the rates computed from the Holden sale represent almost an average of the rates allowed by the Commissioner on these species; the difference could easily be due to local conditions and quality of timber. Accordingly, the rates determined by the Commissioner appear reasonable. The small amount of hemlock, which in 1913 was not used for pulpwood, and which, according to testimony, had practically no value for bark, does not justify a rate in excess of $2. There appears to have been a fair stand of poplar on both tracts in question. This wood was salable in 1913 and could have been easily taken out; accordingly a rate of $2 per thousand is considered reasonable. The balance of the hard woods were of very little value at March 1, 1913, both because of the location as to markets and the difficulties of transportation. The Commissioner has admitted a value of from 75 cents to $1 a thousand for hard woods and various witnesses have testified as to stumpage rates.

It has been brought out by the testimony and evidence that hard woods were cut and sold from petitioner's lands in 1912, 1913, and later years, but only in small quantities. It is therefore evident that the demand was small or that difficulties of logging and marketing prevented active operations, therefore a long period would be required to realize a return on all the hard woods. In view of this feature, a value of $1 a thousand at March 1, 1913, is considered reasonable.

Various witnesses testified that land was worth $1 an acre and young growth $2 an acre. In the computation of the March 1, 1913, value of the Holden tract, $1 an acre was used for land and $1 an acre for young growth. This produced a value remaining for merchantable timber which resulted in the rates previously given. Any increase in value of young growth would result in reducing the value remaining for merchantable timber and would result in lower rates. Accordingly $1 an acre for land and $1 an acre for young growth is considered a fair valuation.

*Judgment will be entered on 15 days' notice, under Rule 50.*