RLC INDUSTRIES CO. AND SUBSIDIARIES, SUCCESSOR TO ROSEBURG LUMBER CO. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 33335-87.          Filed April 22, 1992.

*William H. Bradley, Randolph W. Thrower,* and *John H. Fleming,* for petitioner.

*Robert F. Geraghty, Alan Summers,* and *Randall E. Heath,* for respondent.

GERBER, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE | Deficiency |
|---|---|
| 3/31/78 | $2,171,826 |
| 3/31/79 | 972,853 |
| 3/31/80 | 2,006,426 |
| 3/31/82 | 65,254 |
| 3/31/83 | 3,444,367 |

The sole unagreed issue in this case is whether petitioner properly computed its timber depletion allowance during fiscal years ending March 31, 1980, 1982, and 1983 by combining all its merchantable[1] fee timber into one composite depletion account. Respondent disallowed this combination and recomputed petitioner's depletion for these years using two depletion accounts separately reflecting petitioner's merchantable timber holdings in Oregon and California.

## FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and accompanying exhibits are incorporated by this reference.

Petitioner RLC Industries Co. is a corporation organized under the laws of the State of Oregon with its principal offices located in Dillard, Oregon. Petitioner and its subsidiaries are the successors in interest to Roseburg Lumber Co. & Subsidiaries.[2] Roseburg and its subsidiaries timely filed consolidated Federal income tax returns for its fiscal years ending March 31, 1978, through March 31, 1983. In July 1987, respondent issued a statutory notice determining deficiencies for fiscal years ending March 31, 1978, 1979,[3] 1980, 1982, and 1983. Petitioner filed a timely petition contesting these deficiencies in October 1987.

---

[1]Merchantable timber means trees meeting the minimum size and quality (grade) requirements for production of lumber, veneer, and plywood.

[2]Petitioner and its subsidiaries will be referred to as Roseburg.

[3]Respondent's adjustments to fiscal years ending Mar. 31, 1978, and 1979, relate to net operating losses carried back to these years. These losses were decreased by respondent's adjustments to petitioner's 1981 and 1982 fiscal years.

## I. *Background and Company History*

Petitioner is an integrated forest products company. At all relevant times, Roseburg has been a closely held, family-owned business. Since its beginning, the company and its operations have been controlled by its founder and principal shareholder, Mr. Kenneth Ford. Mr. Ford, who at the time of trial was over 80, continued to serve as chairman of the board and to take a direct interest in all aspects of the company's operations. His son, Allyn Ford, has been involved with the company all his life, and at the time of trial served as vice president of timber and raw material resources.

The company was established in 1936 and began as a small sawmill, manufacturing dimension lumber in the community of Roseburg, Oregon. By 1979, Roseburg had grown substantially and had expanded its product lines to include the manufacture of lumber, particleboard, sheathing, wood chips, and plywood. At the time of trial, petitioner was the largest producer of sanded plywood in the United States. Plywood is made, generally, by "peeling" logs into a thin veneer. Veneer is an intermediate product which is "clipped" into sheets. The sheets are sorted by dimension, dried, and glued together in three-, five-, or seven-ply products.

For Roseburg's most important product, sanded plywood, the "faces" or exterior plies have been made from high-grade, old-growth douglas fir, found primarily in southern Oregon. However, because of declining douglas fir supply, Roseburg developed a method of using "white wood" as the interior core of its plywood product. White wood includes white fir, pine, or hemlock, which are generally low-grade wood species which many manufacturers did not like to use. Roseburg's use of white woods as the core of sanded plywood extended its limited supply of douglas fir and enabled it to make optimal use of all its timber species. Its effective use of these species also afforded the corporation greater geographical flexibility.

As of 1979, all of Roseburg's manufacturing facilities were located in southwest Oregon with its main complex in Dillard, Oregon. As of 1989, the Oregon facilities consisted of six plywood plants, three particleboard plants, two sawmills, two wood chip plants, and one veneer plant. Petitioner's Riddle plywood plant and its Dillard particleboard plant are some of the largest in the world. Petitioner's Oregon operations are an

interrelated and highly integrated complex of manufacturing facilities which enabled petitioner to make optimal use of all its wood species, grades, and manufacturing by-products.

## II. *Roseburg's Timber Supply Through 1979*

In the first 10 years of its existence, Roseburg owned no fee timberlands. Instead, it relied on purchases from small privately held tracts physically close to its sawmill operation for its principal source of wood. However, from 1948 through 1977, Roseburg acquired several parcels of fee timberlands located in southwest Oregon. As of September 1979, Roseburg's Oregon fee timber totaled 1,410,100 MBF[4] (long log scale),[5] had an average cost basis of $7.74/MBF, and a total cost basis of $10,916,000.

The company's policy was to regard its company-owned or fee timber (which was generally mature and ready to harvest) as an "insurance policy" to be held until either economic conditions or forestry conditions dictated harvest of its fee timber. Because petitioner did not generally rely on its own supply of fee timber, its wood supply was derived from cutting contracts on Government or privately owned Douglas County timberland in southwest Oregon. Petitioner was largely dependent upon the Federal Government as its wood supplier. Throughout the 1960s and 1970s, 80-85 percent of Roseburg's timber supply came, directly and indirectly, from Federal timber contracts. Petitioner's Federal timber was purchased pursuant to long-term (3-7 years) cutting contracts from the U.S. Forest Service (USFS) and the Bureau of Land Management.

Timber from Federal contracts was initially projected to remain stable during the 1970s. However, Federal legislation enacted during this period[6] began to decrease the availability

---

[4] A board foot is the amount of wood volume equivalent to a piece of wood 1 foot square and 1 inch thick. Timber and log volumes are generally measured in units of 1,000 board feet expressed as "MBF".

[5] Long log scale refers to a method of estimating the amount of wood in harvested timber where the maximum scaling length of the logs is 40 feet. This is the standard of measurement used in Oregon west of the Cascade Mountains. Conversely, short log scale estimates wood volume in harvested timber using a maximum scaling length of 20 feet. This standard is used in northern California and in Oregon east of the Cascades. California short wood may be easily converted to Oregon long wood scale using a conversion factor of .833 times short log scale volumes.

[6] This included the National Environmental (Policy) Act of 1969, Pub. L. 91-190, 83 Stat. 852; the National Forest Management Act of 1976, Pub. L. 94-588, 90 Stat. 2949; the Wild and Scenic

of Federal timber. Federal set-aside programs enacted in the late 1970s also limited the ability of large companies to acquire increased shares of Government contract timber in some geographical areas.

Although petitioner was largely dependent on Federal timber, it also faced a declining supply of private timber in the immediate areas around its mills. By the mid-1970s, the larger timberland owners in the locality had liquidated most of the available stands. In 1976, the so-called Beuter Report entitled, "Timber for Oregon's Tomorrow", was published. That report predicted decreased wood availability from private lands and future timber shortages throughout most of Oregon in the late 1990s.

In the late 1970s, timber prices escalated dramatically due to diminishing timber supply, inflation, optimistic reports of growing wood demand, and increased housing starts. Between 1970 and 1979, the average statistical high bid on long-term USFS timber cutting contracts for douglas fir in Douglas County rose from approximately $49/MBF to $432/MBF. The limited supply and increased demand created tremendous competition for timber purchases and resulted in price bidding sprees. In order to stay competitive and to retain access to Federal timber, petitioner continued to bid on Government timber sales. Roseburg also dramatically expanded its areas of bidding further north, east, and south into northern California. It also began looking for new sources of fee timberland supply.

Roseburg was unable, for geographical and competitive reasons, to expand its Oregon fee holdings.[7] In the process of expanding its bidding horizons, petitioner discovered that it could avoid a lot of industry competition by purchasing California douglas fir, white fir, pine, and cedar. During 1977-

---

Rivers Act, Pub. L. 93-621, 88 Stat. 2094 (1974); and the Forest and Rangeland Renewable Resources Planning Act of 1974, Pub. L. 93-378, 88 Stat 476.

[7] The Cascade mountain range extends in a north-south direction from Oregon into northern California, forming a natural border which limited the possibility of eastward expansion of Roseburg's timber base. Northern expansion of the timber base was made unfeasible by the highly competitive wood market created by a concentration of timber companies in the vicinity of Eugene, Oregon. Additionally, westward expansion was not possible in 1979 because the limited timberlands between Roseburg and the Pacific Ocean had been heavily cut and were generally not available for purchase. Likewise, the heavy concentration of competitors' facilities in Medford, Grant's Pass, and Klamath Falls resulted in prohibitively expensive fee land and prevented southward expansion in Oregon.

79, Roseburg purchased cut logs from major and small suppliers in northern California for use in its Oregon mills. Although these purchases represented a very small percentage of Roseburg's average annual consumption, the company discovered an economic advantage in the use of these lower grade species. Compared to the same species in Oregon, California white wood was of superior quality for use as inner plies of plywood because of the smaller knot size and the relative lack of "shake".[8] California white fir also produced a higher percentage of "C" grade[9] veneer (compared to "D" grade) than did Oregon white wood.

In 1978, Roseburg investigated the purchase of a veneer mill in Yreka, California, to process undried veneer for shipment back to Roseburg. Petitioner determined that it would gain a competitive advantage from this purchase because of the greater value of the wood species to it for veneer than to the local sawmills. At this time, there were no plywood operators in northern California and sawmills were petitioner's primary competitors. However, the Yreka purchase plans fell through when a nearby sawmill owner preempted the purchase.

III. *Roseburg's Acquisition of Kimberly-Clark Timberlands*

The Kimberly-Clark Corp. (K-C), a paper products company, owned a substantial amount of timberland in northern California during the 1970s. K-C's timber-related assets included approximately 322,000 acres of timberland, a sawmill at Mount Shasta City, California, a sawmill at Anderson, California, and related logging and hauling equipment. As of September 17, 1979, the merchantable timber on the K-C lands, a total of 1,325,000 MBF, contained approximately 27 percent ponderosa pine, 10 percent sugar pine, 19 percent douglas fir, 34 percent white fir, and 10 percent incense cedar.

In 1979, K-C solicited bids for the sale of its northern California operations. K-C management and competitor forestry personnel were aware that K-C had harvested substantial amounts of mature timber from these timberlands in the late 1970s and that the holdings lacked near-term

---

[8]"Shake" is a splintering defect in the wood caused by persistently windy conditions.
[9]"C" grade veneer contains knots with a diameter of less than 1½ inches. "D" grade has larger knots and is less desirable.

timber liquidity. Kenneth Ford had been advised by industry colleagues of K-C's lack of financial liquidity and was cautioned against bidding for its timber properties. Roseburg nonetheless bid on the K-C assets. It did not extensively survey or appraise the timber property prior to bidding.

Roseburg successfully bid for the K-C assets and purchased them for $251,916,330, or $141/MBF. Approximately $250 million of the K-C purchase was financed at variable rates, significantly increasing petitioner's debt load. Financing was collateralized, in part, by the K-C and Oregon timberlands and cash-flow from the harvesting thereof.

Petitioner initially intended to harvest the K-C lands at a rate of approximately 100,000 MBF for the first 3 years and 50,000 MBF annually thereafter, liquidating the timber into the Anderson and Mt. Shasta mills. Closer inspection of the lands after purchase confirmed that K-C had harvested most of the large old growth, leaving mostly small, second-growth timber. The remaining mature timber was scattered. The Mt. Shasta and Anderson sawmills would better accommodate large pine and were not as well suited to process the remaining smaller, secondary growth timber.

IV. *Corporate Management of the California Operations: 1979-85*

K-C had operated its California timber assets as a business division separate and apart from the rest of the company, headquartered in Wisconsin. After its purchase of the K-C operations, Roseburg retained part and modified and streamlined part of the K-C organizational structure. Roseburg also brought over many of K-C's California managers. K-C's assistant general manager for California, Donald Prielipp, came from K-C to Roseburg as then-general manager of California operations. Additionally, the K-C foresters and resource managers came over as a group with Gaylord Briggs as land and timber supervisor. Kenneth Ford instructed Mr. Prielipp to initially keep the K-C organization the same. Kenneth Ford made it clear to Prielipp that he intended to hire new management personnel in manufacturing, finance, and resources, as well as a corporate president.

Mr. Prielipp served as the general manager of California operations from September 17, 1979, through August 17, 1982,

and initially reported directly to Kenneth Ford. Consistent with Mr. Ford's intentions, Carl Wiley was hired in the spring of 1980 as the vice president of manufacturing and gradually took over the reins from Prielipp. Mr. Prielipp thereafter reported directly to Mr. Wiley. In a similar vein, Jerry Duffy was hired by Roseburg to replace the former K-C resource manager. Such transitions were part of an evolutionary change in the K-C management reflecting Roseburg's intention to direct the policy and operating matters of their new company and to integrate the California and Oregon operations. This was in keeping with the "hands-on" management style adopted by Kenneth Ford which cut across all areas of the company.

From 1979 to 1985, Roseburg's California operation was sometimes referred to as the "Anderson Division". Although Roseburg retained much of the K-C structure and personnel, 6 months after acquisition, many of the K-C administrative functions had become Roseburg corporate functions. For instance, accounting, data processing, insurance, credit, office services, and legal services were listed on company organizational charts under the heading "RLC Headquarters". While these and other "corporate overhead" functions were carried on in Anderson on a daily basis, they were nonetheless centralized in Dillard. Cash-flow and payment approvals also came from Dillard, and any capital expenditures or major operational changes had to be cleared first in Oregon. While the day-to-day management of the K-C timber resources and harvest planning were handled by Jerry Duffy and Gaylord Briggs in California, the silvicultural aspects of these functions were coordinated in Dillard with Leonard Gondek, petitioner's chief forester. Anderson also had its own sales force until 1982. However, the company-wide sales function was later centralized in Dillard. Thus, in the initial years after the K-C purchase, petitioner's Oregon and California operations underwent an evolutionary transition toward integrated timber and administrative operations.

V. *Timber Management: 1979-85*

A. *Oregon*

At the time Roseburg acquired the K-C timber, its Oregon fee timber was divided into four management districts/units:

Tyee, North Umpqua, Camis-Riddle/Cow Creek, and South Umpqua. The Oregon timberland was within a radius of approximately 65 miles of Dillard, Oregon. Since 1979, douglas fir has represented 78-88 percent of the total volume of merchantable timber within the geographic areas that encompass Roseburg's Oregon timber districts. Much of this timber was old growth douglas fir which at the time of the K-C purchase was mature and appropriate for harvesting.

Roseburg managed its Oregon timberlands as even-aged forests.[10] Under the even-aged system, petitioner generally clear cut and replanted the overstory of mature trees leaving an even-aged understory of younger trees. Oregon replanting efforts have largely favored the douglas fir species. Subsequent to its acquisition of the K-C timber, Roseburg harvested a large quantity of its Oregon fee timber. Between September 17, 1979, and 1988, Roseburg's volume of old-growth, merchantable fee timber in Oregon declined from approximately 1,423,300 MBF (long log scale) to 487,000 MBF.

## B. *California*

At the time of purchase, the K-C timberlands were comprised of mostly smaller second-growth timber of predominantly pine, fir, and cedar species. Petitioner's California timberlands, which are within a radius of about 105 miles of Dillard, Oregon, were divided into five districts: Anderson, Mt. Shasta, Fall River, Alamanor, and Wildwood. Separate district supervisors managed the on-the-ground forestry and logging activities in each of the five districts.

State regulation of California timberland was thought to be somewhat more rigorous than the State regulation of Oregon timberland. The regulation differences related mainly to conservation and the method of harvesting the timber. The

---

[10]An even-aged stand has trees that are all within 30 percent of the same age class, whereas an uneven-aged stand is a stand of mixed-aged classes ranging from small trees to mature timber.

differences between each State's regulation would not be an impediment to integration of California timber into petitioner's Oregon operations.

Gaylord Briggs had been the land and timber supervisor for the K-C timberlands and the chief forester for petitioner's California operations since the K-C acquisition. He managed the K-C district supervisors and was supervised by Jerry Duffy, the resource and timber and forestry manager for the California operations. Duffy reported directly to Roseburg's executive vice president for resources, Allyn Ford.

Leonard Gondek was the chief forester for Roseburg and the Oregon operations since 1974 and reported directly to Allyn Ford. Both Gondek and Jerry Duffy were charged with the responsibility for developing and administering proper silvicultural technology for the company's timberlands. Gondek was also required to monitor and support silvicultural programs for California lands. Although Gondek and Duffy were theoretically equals and managed different geographic areas, Gondek was nonetheless very involved with the K-C timberlands, generally directing and overseeing the silvicultural and harvesting efforts of Jerry Duffy and Gaylord Briggs. Policy matters relating to timber cultivation, harvesting, and management were coordinated company-wide through Mr. Gondek. However, the day-to-day management for the California lands remained with Briggs and Duffy.

The K-C timberlands were managed using a selective harvest method which left trees of varying species and age classes and generally did not require major replanting. After acquisition, petitioner undertook sophisticated reforestation and replanting procedures on the K-C lands, some, but not all, of which related exclusively to recovery of burned areas. The growth on K-C lands at the time of purchase was such that Roseburg, in accordance with its initial intention to harvest immediately, could have annually cut a sustained yield of 30 million board feet of smaller diameter wood. K-C foresters, however, recommended a management plan designed to "rest" the K-C timberlands so that they could recover from the heavy K-C harvests. The plan called for a 10-year moratorium on timber harvests, except for salvage and thinning operations designed to enhance the overall health of the timberlands and increase their sustained yield capacity.

## VI. *The 1980s Timber Crash*

Although petitioner had considered various approaches to managing its California timber, conditions dictated its approach. Roseburg was forced to rest the K-C timberlands by virtue of the timber crash of the early 1980s. In late 1980, timber and forest products markets went into a steep decline. Soaring interest rates and plunging housing starts caused the price of manufactured forest products to drop by 40-50 percent. By the beginning of 1982, douglas fir prices had dropped to $125/MBF from $430/MBF in late 1980.

Roseburg was having great difficulty selling its products and was forced to curtail production at several Oregon plants. At the same time, it was committed with respect to 1,200,000 MBF of unharvested, priced above market Government contract timber. Under the Government contracts Roseburg was obligated to harvest but could not do so without grave financial loss. In 1983, Federal legislation provided the timber industry some relief by allowing companies to: (1) Buy out 15-20 percent of their most expensive contracts; (2) continue bidding on lower priced, post-collapse contracts; (3) commingle high- and low-priced timber; and (4) spread the expenses of the high-priced timber over a 5- to 6-year period. However, companies were required to commit to logging remaining sales under a strict, but extended time limit. To achieve the cost averaging benefit, Roseburg committed to substantial low-priced timber purchases, with the result that it had a surplus of Oregon wood which lasted throughout the 1980s.

## VII. *Product Integration 1979-85*

The poor timber markets of the early 1980s led the company to limit its harvest from the K-C lands during the early 1980s. Petitioner harvested only 291,000 MBF (long log scale) from its California fee lands from September 1979 through March 1983. Despite the Oregon timber glut and reduced prices, Roseburg was forced to liquidate its Oregon timber in order to pay down the K-C purchase debt.

The small amount of timber harvested from the K-C timberlands mainly consisted of residual old-growth douglas fir, ponderosa pine, and white fir which was processed at the Anderson and Shasta sawmills. In December 1982, Roseburg acquired a veneer plant in Weed, California. It began operat-

ing in mid-1983, and processed into veneer most of the white fir produced or purchased in California.

The Weed facility produced "C" and "D" grade veneer suitable for sheathing, underlayment,[11] and inner core material for sanded plywood. The Weed plant peeled white fir logs of 24-26 inches "diameter inside bark" (DIB). DIB is the size of a log measured by the diameter of its solid wood on the top, or small end. Where tree diameter is unclear, under general forestry principles, the scaling diameter, or DIB, is the diameter assumed. Beginning in late 1983, white fir logs in excess of 26 inches DIB were shipped by backhaulers from Weed to Riddle, where they were peeled for plywood manufacture. According to Briggs' projections, white fir logs larger than 26 inches DIB would represent less than 6 percent of the projected harvests in the 1980s and 1990s.

During petitioner's 1980 through 1983 fiscal years, almost all of the timber harvested from the K-C lands was processed at the company's California facilities or sold to third parties. There was little product integration between California and petitioner's Oregon facilities during this time. Logging projections prepared for 1983 indicated that California timber to be sold or transferred to Riddle would represent about 12 percent of the projected harvest from the fee lands. In fiscal years 1984, 1985, and 1986, veneer sales from Weed to Roseburg's Oregon facilities were approximately 1, 2, and 13 percent of total sales, respectively. In these years, 99, 98, and 87 percent, respectively, of total Weed veneer was sold to manufacturers other than Roseburg.

## VIII. *Petitioner and the Plywood Market 1985-90*

Roseburg manufactured a diversified mix of high- and low-value timber products but emphasized high-margin products. High-margin products included sanded plywood, siding, dimension lumber, specialty plywood, decorative paneling, particleboards, and wood chips. Besides sanded and decorative plywood, petitioner's plywood commodities also included

---

[11]Sheathing is a "CD" material and is a structural, low-value product. Underlayment, the next level up, is also a low-value product but is thicker than sheathing and many of its knots are plugged. The highest level, or "A" veneer, is used on the face of sanded material or to make siding.

sheathing and underlayment. The K-C pine and white fir were especially well-suited to the production of underlayment and sheathing.

Sheathing and underlayment compete against and are substitutes for waferboard[12] and oriented strand board (OSB), which are reconstituted panel products made throughout the United States. Reconstituted products do not, however, compete with sanded plywood. Sanded plywood has retained a strong market niche and remains a more consistently profitable product. Additionally, in a seller's market, the price of sanded plywood increases much faster than underlayment or sheathing.

Economic data available to petitioner indicated that the structural panel market (waferboard and OSB) experienced most of the industry growth since 1975 and posed a serious threat to traditional plywood markets. In fact, it was projected that growth in nonveneer panel usage would have an adverse effect on plywood producers, particularly douglas fir producers, through 1990-91. As part of its 1987-92 business plan, petitioner's plywood product group recommended the construction of an Anderson, California, plywood plant to increase petitioner's share of the sheathing market and to maintain cost efficient plywood's share of the panel market.

Although petitioner contemplated the construction of a California plywood plant, it was not built for several reasons. First, the supply of douglas fir and other Oregon timber began to deplete in the 1980s, and it was projected to reach a "starvation point" beginning in 1991. Given the large plywood capacity at the Oregon operation, the California timber would be needed to run the Oregon facilities. Additionally, data showed that the western share of the national plywood market was declining. Petitioner's officers decided that it was unwise to add new capacity in such a market. Petitioner also decided that, rather than focusing on the manufacture of sheathing, it would be better to use its veneer to manufacture higher grade premium, sanded plywood which could command a premium price. Finally, expansion into sheathing manufacture was later made possible by petitioner's 1988 acquisition of a

---

[12]Waferboard consists of wood chips which are mixed with resin, run through a hot press, and formed into a solid panel.

plywood plant at Red Bluff, California. The plant produced underlayment and sheathing through 1990 and was to be replaced in 1992 by better facilities.

IX. *Corporate Expansion and Management: 1985-90*

Until 1985, all of petitioner's timber and forest product manufacturing activities were conducted by Roseburg Lumber Co. Effective March 31, 1985, Roseburg's board of directors approved a plan of reorganization undertaken to separate Roseburg's businesses, increase management and financial efficiency, and encourage business opportunities and expansion. Pursuant to the plan, RLC Industries Co. was created as a holding company with three wholly owned subsidiaries, one of which was Roseburg Forest Products Co. (RFP). RFP was also the parent company to three second-tier subsidiaries, one of which was Roseburg Resources Co. (RRC). After the reorganization, the manufacture of forest products was carried on by RFP, and petitioner's Oregon and California fee timber was held and managed by its subsidiary, RRC.

During its 1987 fiscal year, RLC incorporated a new entity, NOCA Timber Co. (NOCA), as a wholly owned subsidiary of RRC. In December 1986, NOCA acquired the so-called Walker timberlands which were located in northern California. The Walker timberlands contained approximately 727,500 MBF (long log scale) of largely old-growth, merchantable timber. NOCA harvested substantial volumes of this timber during its 1987, 1988, and 1989 fiscal years. When NOCA purchased the Walker timberlands, RFP simultaneously purchased all of the stock of the Paul Bunyan Lumber Co., which had also been owned by the Walker family interests. The assets held by Paul Bunyan Lumber Co. included a sawmill in Anderson.

In December 1987, a wholly owned, first-tier subsidiary of RLC called Dillard Lumber Co. entered into an agreement to acquire all the outstanding stock of Diamond Lands Corp. The assets held by Diamond included approximately 2.08 billion board feet (long log scale) of merchantable northern California timber, a sawmill, and plywood plant located in Red Bluff, California. After its acquisition, Diamond remained a wholly owned subsidiary of Dillard Lumber Co. and continued to hold the timberlands it held prior to acquisition by Dillard.

As of 1989, petitioner's California facilities consisted of one veneer plant, four sawmills, and one plywood plant. At the time of trial, many corporate overhead functions benefiting all subsidiaries and divisions were centralized in Dillard. Included in these functions were finance, sales and marketing, resources, manufacturing, and personnel. Day-to-day corporate management and operations relating to petitioner's northern California holdings were consolidated into a separate operation. Included in these functions were timber management, forestry, manufacturing, and product sales. These operations were overseen by the northern California general manager, with timber, forestry, and sales managers reporting to both the California general manager and to their respective executive vice presidents.

## X. *Product Integration: 1985-90*

By 1985, the timber markets had recovered from the price crash of the early 1980s. However, by the late 1980s, the douglas fir supply was rapidly declining and the Federal timber supply was being threatened by environmental concerns over the northern spotted owl. These events, along with the excess manufacturing capacity in Oregon and the growing need to use the California wood and veneer at the Oregon plants, resulted in increased wood flow and product integration between the K-C and Oregon operations after fiscal year 1986. In years 1987 through 1989, approximately 50 percent of the veneer produced at Weed was transferred to Riddle and other Roseburg manufacturing facilities in Oregon, such as Dixonville and Coquille and Red Bluff in California. At the time of trial, it was estimated that 25-30 percent of petitioner's total white wood for use by the Riddle facilities came from California sources. Over the last few years, despite several strikes, 10 percent of petitioner's total veneer and logs came from California.

## XI. *The Geographic Area of Roseburg's Timberlands*

Petitioner's Oregon and K-C timberlands straddle the douglas fir, mixed evergreen, mixed conifer, and pine-type forest cover zones. A portion of petitioner's Oregon holdings is

also within the so-called Klamath region. The Klamath[13] area extends between 41 and 43 degrees north latitude and east to west from the crest of the southern Cascade Mountains to the Pacific Ocean. The region encompasses a complex of mountain ranges in southwestern Oregon and northern California. The northernmost portion of the range in Oregon is commonly identified as the Siskiyou Mountains. The region is a complex vegetative area and a transition zone from northwestern cover type to the mixed conifer zone characteristic of northern California timberlands. According to forestry authorities, the Klamath region is comprised of two closely related forest types: mixed evergreen and mixed conifer. The mixed evergreen zone is located in the western Siskiyou Mountains (in the direction of the Pacific coast), and its most important tree species are douglas fir and tan oak. Sugar pine, ponderosa pine, incense cedar, and jeffery pine may be present in this zone.

The mixed conifer zone begins from about 43 degrees north latitude, south along the western flanks of the Cascade range at elevations of 750-1,400 meters. These forests are also found in the eastern Siskiyou Mountains at higher elevations. Like the mixed evergreen, the mixed conifer zone includes douglas fir. However, unlike the evergreen zone, the mixed conifer zone is dominated by sugar pine, ponderosa pine, and incense cedar.[14]

All four Oregon districts are predominantly douglas fir/mixed evergreen cover. Since 1979, douglas fir constituted 78-88 percent of the total inventory in the Oregon districts. During this period, South Umpqua had 85 percent douglas fir. The Society of American Foresters classifies forests as "pure" species if a single species comprises over 80 percent of the timber volume.

Forest cover around the Anderson and Weed operations is largely "mixed conifer" type. However, petitioner's Almanor Basin, Big Valley, Harvey, and Poison Lake operations include 61,000 acres on the east side of the Cascades that is dominated

---

[13]Also referred to as the southwest Oregon/northern California area.

[14]The line of demarcation between the east and west Siskiyou forest types is unclear. However, forestry maps indicate that the mixed conifer zone begins just south of and may include a small southeast section of petitioner's South Umpqua District. These maps also indicate that the Tyee, North Umpqua, and Camas Riddle Districts are within the douglas fir/mixed evergreen zones.

by the interior ponderosa pine and is a "pure pine" type forest cover that is not included in the mixed conifer zone.

## XII. *Roseburg's Accounting for Timber Depletion*

Prior to 1981, Roseburg kept its timber holdings in separate blocks, by date of acquisition, for purposes of determining its depletion allowance for financial accounting and for tax purposes. This method of blocking timber resulted in a separate cost basis being carried for each of 56 separate accounts. During the audit of Roseburg's fiscal year ending (FYE) March 31, 1976, and March 31, 1977, Revenue Agent Forester Shag Taynton suggested to Roseburg's representatives that "the fee timber owned by the company all be placed in one depletion account." Roseburg declined to follow this suggestion, and the district director did not require Roseburg to make the change. Roseburg's return for FYE March 31, 1980, was filed on September 12, 1980, before completion of respondent's audit of petitioner's FYE March 31, 1978, and March 31, 1979. Petitioner's 1980 return was the first return which reflected Roseburg's acquisition of the K-C timberland. On the initial return, Roseburg computed its depletion using 57 separate accounts: 56 for its Oregon fee timber and one for the California fee timber acquired in 1979.

By fall 1980, it had become clear that due to unforeseen circumstances the K-C harvests would be insufficient to finance its purchase debt. John Stevens, then a vice president with International Paper Co., suggested to Kenneth Ford that Roseburg combine its Oregon and California fee timber into a single depletion account. A composite account would combine petitioner's high basis in its K-C lands with its low basis in the Oregon holdings, thereby offsetting some of the section $631(a)$[15] capital gains realized on petitioner's liquidation of the Oregon tracts. In April 1981, Shag Taynton prepared a report on the audit of petitioner's FYE March 31, 1978, and March 31, 1979, in which he made the following statements:

A number of timberland tracts were purchased in the audit tax year. * * * However, in reviewing the depletion account for fee lands, it was noted that the Company is keeping each tract in a separate depletion account. This

---

[15]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

results in a large number * * * of depletion rates and makes it difficult to impossible for a forester to audit and verify the cost basis on fee cutting. This situation was discussed with Jack Snodgrass in the prior audit, and it was suggested that the fee timber owned by the Company all be placed in one depletion account and the depletion rate calculated according to the Regulations under Sec. 1.611-3. Combining all the Company timber into one block for depletion purposes would simplify the Company's accounting procedures considerably.

Although Taynton acknowledged the K-C purchase in his audit report, the acquisition of these fee lands was not a consideration in the 1978-79 audit. The aggregation suggested by respondent related to only the Oregon timber properties. At some point prior to April 1981, petitioner took Taynton's advice with respect to the 1978 and 1979 fiscal years and combined 50 (or more) depletion accounts into one composite account.

Roseburg's FYE March 31, 1980, return was amended on March 13, 1983, following completion of respondent's audit of petitioner's 1978-79 fiscal years. The 1980 amended return combined all of petitioner's fee timber in Oregon and California into a single depletion account with a depletion rate of $71.85 MBF (long log scale).

Roseburg consistently computed depletion for fee timber based on a single depletion account, including all fee timber, on its original returns for FYE March 31, 1981, through March 31, 1986. In 1981, Roseburg also changed its method of accounting for financial statement purposes, and since that time has consistently reported its Oregon and K-C fee lands in a single depletion block for financial accounting purposes. Roseburg's financial statements are audited by the firm of Arthur Andersen & Co. Arthur Andersen & Co. approved the change in accounting practice from many blocks to one block because, in its opinion, the new practice was preferable to the old and it also clearly reflected income.[16]

Prior to changing over to a composite account, petitioner's accountants noted on financial statements that—

Depletion of fee timber is provided at rates computed by dividing unrecovered costs by estimated recoverable volume for each specific tract.

---

[16]Arthur Andersen used the following language to reflect its approval: "[The composite method is] in conformity with the general accepted accounting principles applied on a consistent basis subsequent to the change (with which we concur) made as of April 1, 1980 in the method of computing depletion as described in note 1 to the financial statements."

The cost of timber varies widely; therefore, the resulting cost of timber can fluctuate significantly each year depending on the tracts cut.

After conversion to a composite account, petitioner's accountants included note 1 to the 1981 financial statements as follows:

the Company changed its method of computing depletion on fee timber from a separate tract rate for each tract to a composite rate for all tracts. The Company's timber holdings comprise a single resource pool to provide raw materials for its operations. The single composite rate method more closely reflects the Company's philosophy and practice of managing its timber as a single resource base.

The primary reasons for Arthur Andersen's approval of petitioner's change to a composite account were expressed as follows:

1. A single composite rate would remove the possibility for wide swings in the depletion rate from year to year caused by the selection of the tracts to be harvested.

2. The Company was centrally managed and, although it had a number of operating locations, the timber was managed as a single resource base. Use of a composite rate more closely reflected this policy.

3. Use of a composite rate for depletion was in accordance with acceptable methods used within the forest products industry in the reporting of depletion for financial reporting purposes.

During RLC's fiscal years 1980 through 1983, it harvested 497.1 MBF of timber from its fee lands, 94 percent of which was harvested from the Oregon timberlands. Had RLC been required to maintain two separate depletion accounts for fiscal years 1980 through 1983, the adjusted basis for depletion (unit rate) and depletion allowances (total cost) for the fee timber harvested in Oregon and California would have been:

|  | Oregon | | Cost of Harvested Timber | California | | Total |
| --- | --- | --- | --- | --- | --- | --- |
| FYE | unit rate | MBF | Total cost ($000) | unit rate | MBF | cost ($000) |
| 3/31/80 | $7.69 | 127,200 | $978 | $137.41 | 2,700 | $371 |
| 3/31/81 | 7.60 | 103,000 | 783 | 134.74 | 5,700 | 768 |
| 3/31/82 | 7.48 | 48,400 | 362 | 131.29 | 3,100 | 407 |
| 3/31/83 | 7.39 | 212,600 | 1,571 | 126.99 | 17,600 | 2,235 |
| Total/Avg. | 7.52 | 491,200 | 3,694 | 129.93 | 29,100 | 3,781 |

During the 3 years at issue, petitioner's accounting method generated depletion deductions totaling $34,797,000. Use of respondent's method would have yielded a total deduction of

$7,475,000. Respondent's large case manager handling RLC's audit approved the adoption of a single account for the Oregon holdings for FYE 1978 and 1979 because a single account simplified the audit process, resulted in almost no change in the amount of the deduction, and was therefore a reasonable allowance for depletion which did not distort income. However, with respect to the composite account adopted by petitioner in FYE 1980 and 1981, the case manager concluded that, based on all the facts before him at the time of audit, the composite account did not satisfy the depletion regulatory criteria. He also concluded that use of the composite account produced a distortion of income because RLC's concentrated cutting of Oregon timber shifted the costs to unharvested, high-cost, K-C timber to the low-cost Oregon timber. However, he acknowledged that an aggregation of tracts with widely varying depletion bases would be permissible as long as, all things considered, the regulatory criteria were met. This would be so even if the aggregation resulted in a higher depletion deduction.

The case manager also acknowledged that, in the course of the administrative proceedings, he learned that other timber companies maintained multistate depletion blocks. While forest product companies vary in their depletion accounting methods, composite blocks are sometimes used in the industry as a basis for depletion calculations. Other timber companies utilizing composite blocks also utilize accounts/blocks covering more than one State or large geographic areas.

Concerning certain more recent timberland acquisitions, petitioner has established separate depletion blocks. In one such instance, Diamond Lands Corp. maintains a total of five timber depletion accounts based on species, representing the historical tax basis and depletion methods in use prior to acquisition. For purposes of computing depletion on the Walker timber, NOCA maintains 110 separate accounts for its fee timber based on location, age, and species. In that instance, Roseburg was required by its lenders to maintain the Walker timberlands in separate subsidiaries and was therefore unable to include the timberlands for tax purposes within its single depletion block.

RFP and Roseburg Lumber Co., the Roseburg manufacturing subsidiaries, use the last-in, first-out (LIFO) convention to

account for inventory, and maintain for Oregon and California a single wood content LIFO pool. However, for internal purposes, different log pools are kept for Oregon and California logs to reflect intercompany pricing and the different costs of the two types of logs.

## XIII. *Respondent's Statutory Notice*

On July 15, 1987, respondent issued a statutory notice to petitioner in which, among other things, respondent adjusted petitioner's section 631(a) long-term capital gains for tax years ended March 31, 1980, through March 31, 1983. With respect to the section 631(a) adjustment relating to the single depletion block, the notice stated that the inclusion of the California and Oregon fee timber in a single block for years 1981,[17] 1982, and 1983, is not allowable because the single block method of accounting does not result in an accurate computation of depletion, does not clearly reflect income, and has not been made in accordance with the provisions of section 611.

## OPINION

The question we consider concerns the pooling of timber holdings in computing the allowance for depletion of fee timber and is one of first impression for this industry. Long-standing legislative regulations provide guidance for computing the allowance. We consider here whether petitioner's method is permissible under that statutory and regulatory framework. If petitioner's method is permissible, we have been asked to consider whether respondent has the discretion to impose a change from a permissible method and, if so, whether respondent abused that discretion in requiring a change in this case.

## A. *The Statutes and Regulations Concerning the Allowance for Depletion of Fee Timber*

The computation of depletion for purposes of oil and gas is based upon a percentage established by Congress. Unlike oil and gas, the allowance for timber depletion "functions as a cost recovery system that attempts to allocate the various capitalized costs of acquiring and developing timber to its annual

---

[17]Respondent's determination did not result in a deficiency for the 1981 year.

production." Accordingly, "This function of depletion in a sense resembles an inventory system of allocating costs to goods sold during the year." Dzienkowski & Peroni, Natural Resource Taxation: Principles and Policies 326 (1988).

Section 611(a) provides that in the case of mines, oil and gas wells, other natural resources, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion. Section 611 is a pervasive, but tersely worded, statute permitting depletion. Congress, in order to carry out its intent, granted the Secretary authority to promulgate regulations to provide for the depletion of each type of natural resource and timber. The method for computing timber depletion[18] is set forth in the regulations, which include a cost depletion rate for each timber account maintained by the taxpayer. Sec. 1.611-3(b)(2), Income Tax Regs.[19] The timber account is a ledger account reflecting and differentiating the costs and quantities of timber, land (nondepletable), and other resources on each "block" of timber. Sec. 1.611-3(b)(2), (d)(1), Income Tax Regs.; see also Dzienkowski & Peroni, *supra* at 327. Timber depletion is delineated in terms of a "block" concept. A "block" is defined, in general terms along with examples, in the regulations under section 611, as follows:

A block may be an operation unit which includes all the taxpayer's timber which would logically go to a single given point of manufacture. In those cases in which the point of manufacture is at a considerable distance, or in which the logs or other products will probably be sold in a log or other

---

[18]In the case of timber, the concept of depletion is used in two distinct ways. In some instances, the amount of depletion is allowed as a *deduction* in computing taxable income. In other instances, including those where Section 631(a) and (b) applies, the amount of depletion is deemed to be the *basis* allocable to the timber cut or disposed and is used to reduce the amount realized or deemed realized when determining gain or loss. Thus, a timber owner is able to recover his investment in his trees when they are cut either by deducting the amount of depletion or by using such amount to reduce the amount realized or deemed realized on its disposition. [Briggs & Condrell, Tax Treatment of Timber 67 (7th ed. 1986); fn. ref. omitted.]

[19]The cost depletion is calculated by first determining a depletion unit for each timber account. This is accomplished—

by dividing (i) the basis provided by section 1012 and adjusted as provided by section 1016, of the timber on hand at the beginning of the year plus the cost of the number of units of timber acquired during the year plus proper additions to capital, by (ii) the total number of units of timber on hand in the given account at the beginning of the year plus the number of units acquired during the year plus (or minus) the number of units required to be added (or deducted) by way of correcting the estimate of the number of units remaining available in the account. [Sec. 1.611-3(b)(2), Income Tax Regs.]

market, the block may be a logging unit which includes all of the taxpayer's timber which would logically be removed by a single logging development. Blocks may also be established by geographical or political boundaries or by logical management areas. Timber acquired under cutting contracts should be carried in separate accounts and shall not constitute part of any block. In exceptional cases, provided there are good and substantial reasons, and subject to approval or revision by the district director on audit, the taxpayer may divide the timber in a given block into two or more accounts. For example, timber owned on February 28, 1913, and that purchased subsequently may be kept in separate accounts, or timber owned on February 28, 1913, and the timber purchased since that date in several distinct transactions may be kept in several distinct accounts. Individual tree species or groups of tree species may be carried in distinct accounts, or special timber products may be carried in distinct accounts. Blocks may be divided into two or more accounts based on the character of the timber or its accessibility, or scattered tracts may be included in separate accounts. If such a division is made, a proper portion of the total value or cost, as the case may be, shall be allocated to each account. [Sec. 1.611-3(d)(1), Income Tax Regs.]

The pertinent parts of this regulation have, for purposes of this case, remained essentially unchanged for over 70 years. The regulation is in permissive terms and considered alone would appear to provide wide latitude to utilize accounts or "blocks" in accord with the personalized operation of each taxpayer. Once a block is properly aggregated, the composite cost of timber parcels is averaged for purposes of depletion irrespective of differences in the original cost of the various timber components.

On the basis of this regulation, petitioner calculated its depletion deduction using a composite timber account comprised of its Oregon and California holdings. Respondent contends that the single depletion account failed to clearly reflect income, the Oregon and K-C timber did not constitute a single "block" as defined by the regulations, and the district director did not abuse his discretion in adjusting petitioner's depletion account by dividing it into separate accounts for Oregon and California. We will consider whether petitioner is in compliance with the regulations, and if so, whether petitioner's method clearly reflected income and/or whether respondent abused her discretion.

In order to measure petitioner's conformity with section 1.611-3(d)(1), Income Tax Regs., it is necessary to understand certain "words of art" in the context of the forestry industry. "Block", "management area", and "geographical boundary" are

terminology which we must preliminarily consider in order to measure whether petitioner complied with the statute and regulations.

### 1. *The Concept of "Block" in the Timber Industry*

The term "block"[20] was formally introduced into Federal income tax parlance by its use in a 1919 Bureau of Internal Revenue Form T, General Forest Industries Questionnaire, sent to members of the timber industry. When the concept was first being considered in connection with taxation, lumber operations were limited by their accessibility to the timber supply. The mill or manufacturing plant would be built close to or at the situs of the timber, and when the timber supply was exhausted, the mill would cease operations. See, e.g., *Alexander Bros. Lumber Co. v. Commissioner,* 22 B.T.A. 153, 154-157 (1931). The geographic and management area of a block in that setting was more easily defined due to physical accessibility and transportation limitations which, to some extent, no longer exist. Inherent in the early definition was the economic necessity of pooling timber tracts to justify capital investment in the mill processing equipment.[21] Conceptually, a contemporaneous block could be similarly conceived, but may be more complex in terms of the management or geographical area due to the elimination of some of the earlier impediments which limited the scope of the timber industries' operations.

The 1919 questionnaire described the term "block", as follows:

> An operation unit which includes all of the taxpayer's timber which would logically go to a single given point of manufacture (or to one of a group of interchangeable points of manufacture); however, in those cases in which the point of manufacture is at a considerable distance, or in which the logs will probably be sold in a log market, as on Puget Sound, the block may be a

---

[20]Regulations under the 1916 Revenue Act referred to the term "en bloc" in connection with the taxation of timber transactions. Petitioner advised that the use of the term "block" apparently first appeared in the 1919 questionnaire.

[21]One commentator of the times, in connection with the nontax theory behind including several tracts of timber in a single block, explained:

> A number of scattered tracts may have little value by themselves, but when united with others to make a block which can be profitably operated they may become very valuable. It is estimated that before building a large mill a 20 year's supply of timber should be available for it. * * * [Montgomery, Income Tax Procedure 1242 (1925).]

logging unit which includes all of the taxpayer's timber which would logically be removed by a single logging development.

\*        \*        \*        \*        \*        \*        \*

Since it is required for depletion purposes that there be carried on the books of the taxpayer a separate account for each block of timber, or for each species or group of species valued separately, the block should, for simplicity in accounting, be made as large as possible, within the limitations indicated above.

Petitioner argues that the suggestion, contained in the definition for purposes of the 1919 survey, that the block be made as large as possible is conceptually embodied in the current regulatory version of the definition of a "block". Petitioner points out that the concepts involving blocks have not changed, but that the potential for blocks to be composed of a larger geographical area is due to seven developments in the forest products industry. Those developments are: (1) Reduction in relative costs of transportation coupled with the ability of a mill to service a large geographical area; (2) the ability to use all parts of all varieties of trees in a forest, coupled with integration of various interrelated mills; (3) increase in wood consumption; (4) the ability to manage a larger area due to enhanced communications; (5) more competition within various wood sources; (6) financial impracticability for mills to own all of the timber sources needed for their operation; and (7) the availability of wood from Government-owned forests in the same geographical area provided the expansion of a mill's wood source to include Government lands. All of the factors cited by petitioner interrelate. The essence of these factors is that modern methods, techniques, supply, and market demand have caused or forced contemporary producers of wood products to be able to effectively utilize a larger geographical area. We agree with petitioner that in a contemporary context a larger geographical area (than envisioned in the original formulation) could be classified as a "block" and may comport with the definition contained in section 1.611-3(d)(1), Income Tax Regs. Even though we agree that the potential for a larger block may exist, we note that the ultimate measure of whether a particular aggregation of timber property constitutes a "block" depends upon geographical, varietal, and operational continuity, and related considerations.

## 2. *Management Area and Geographical or Political Boundaries*

Under section 1.611-3(d)(1), Income Tax Regs., a "block may be an operation unit which includes all the taxpayer's timber which would logically go to a single given point of manufacture. * * * Blocks may also be established by geographical or political boundaries or by logical management areas." The parties have provided practical and dictionary definitions of these words. We see them as expository modifiers of, and limitations upon, the term "block". In the context of the regulations, these modifiers are not necessarily restrictive, but appear to be used in an attempt to assist in the process of defining a logical block.

Section 1.611-3(d)(1), Income Tax Regs., as noted, permits the establishment of blocks based upon "geographical or political boundaries or by logical management areas." The use of the term "geographical or political boundaries" remains undefined in the statute or regulations and could be narrowly or broadly defined depending upon one's point of view. It could mean the smallest political or geographical subdivision or the largest. In other words, it could be referring to a township or county or to the entire nation. We view these terms as guides rather than limits upon taxpayers, and any reasonable and/or logical area which otherwise satisfies the block concept may be formulated geographically or politically. Additionally, a block may also be subdivided into smaller and separate accounts by means of geographical or political subdivision.

The use of the term "logical management areas" is of necessity more limiting than geographical or political boundaries. The logical management area must comport with the modus operandi of the taxpayer. The logical management area concept is the most subjective and the most critical concept in the regulation. "[G]eographical", "political", and "point of manufacture" are terms which are more easily formulated through observation and analysis of objective facts. A management area is more elusive and difficult to define and may be more limiting than the other concepts or terms. Once it is decided that a taxpayer has pooled the timber in an appropriate area, then computation of the depletion allowance is based upon an average amount per tree, irrespective of the actual cost of the tree harvested.

In this regard, there is no case precedent or guide to follow in deciding whether a particular block designation is logical. We think it appropriate to make this decision on a standard of reasonableness based upon a facts and circumstances standard. In other words, we will consider petitioner's history, plans, actions, and any other relevant circumstances in order to determine whether the block in question is a logical management area and/or meets the standards of the regulations and intent of the statute.

3. *The Parties' Arguments Regarding Whether Petitioner May Include Oregon and California Timber Land in a Single Block*

The parties agree that a taxpayer has relatively broad latitude to form or divide blocks.[22] The parties also agree that the regulations permit a taxpayer to combine multiple timber acquisitions into a single block.[23]

Concerning the combination of the Oregon and California timberlands, respondent argues that it did not constitute a block in accord with the regulations because: (1) The opinions of expert witnesses proffered by respondent support a finding that the Oregon and California lands constitute separate management areas with different varieties of trees which should constitute separate blocks; (2) the operational activity

---

[22]Although the terms "block" and "account" may appear to be synonymous, they are not. As we read the regulations, a block may equal an account or a block may be divided into two or more accounts. See sec. 1.611-3(d)(1), Income Tax Regs.

[23]On this point respondent also combined an argument concerning sec. 1.611-3(d)(5), Income Tax Regs., which provides:

For good and substantial reasons satisfactory to the district director, or as required by the district director on audit, the timber or the land accounts may be readjusted by dividing individual accounts, by combining two or more accounts, or by dividing and recombining accounts.

Respondent argues that this regulation gives her authority to require the division or combination of timber properties for purposes of computing the depletion allowance. Respondent also argues that petitioner must show that respondent abused her discretion because respondent determined that petitioner should divide its account or block as between California and Oregon. These arguments concern questions which are discussed later in this opinion. On this aspect (whether petitioner's combination of the Oregon and California timberland constitutes a block under the regulation) respondent's argument (that she is empowered to readjust the timber accounts) begs the initial question of whether petitioner is within the regulatory framework. We address the discretion question in the second portion of this opinion in the context of whether respondent's discretion extends to a situation where a taxpayer has complied with the regulatory guidelines. We first consider whether petitioner's pooling of timberlands was within the guidelines. If we decide that petitioner was without the regulatory framework, then it would follow that respondent has not abused her discretion.

during the 1980 through 1983 years did not reflect a single integrated operation and little, if any, California timber was used in the manufacture of wood products in Oregon; (3) the Oregon and California timberlands were separately operated and managed; and (4) Oregon and California are separate geographical and political boundaries for purposes of the regulatory definition of a block.

Petitioner argues that the combination of the Oregon and California timberlands did constitute a block in accord with the regulations because: (1) The opinions of expert witnesses proffered by petitioner support a finding that the Oregon and California lands constitute a single management area which constitutes a single block for depletion purposes; (2) the Oregon and California timberlands are in a geographic area which is coextensive with the timber supply for its mills; (3) the acquisition of the California timberland as a source of timber supply was a business necessity due to a reduced and dwindling timber supply in the immediate area of petitioner's mills; (4) petitioner's extensive capital improvements (largest sawmill in United States, etc.) in Oregon exceeded the local timber supply and was intended to consume timber outside of the Dillard area, including timber in northern California and southern Oregon; (5) petitioner was a centrally managed "natural business unit" with Mr. Ford as a "hands-on" owner; and (6) petitioner, for purposes of valuing its company-wide inventory pool, uses, with a few minor exceptions, the dollar value method for LIFO inventory.

## B. *Does Petitioner's Block Come Within the Regulatory Standards*

### 1. *Background Facts*

Petitioner is a closely held, family-owned, integrated forest products company, controlled by its founder and principal shareholder, Mr. Ford, from Dillard, Oregon. The company's policy was to regard its company-owned or fee timber as an "insurance policy" to be held until either economic conditions or forestry conditions dictated harvest of its fee timber. Petitioner was greatly dependent upon the Federal Government as its prime wood supplier, and it also faced a declining supply of private timber in the southern Oregon areas around

its mills.  Petitioner dramatically expanded its areas of timber bidding further north, east, and south into northern California as the timber supply decreased.  It also began looking for new fee timberland and discovered that it could avoid industry competition by purchasing California douglas fir, white fir, pine, and cedar.  During 1977-79, Roseburg purchased cut logs from major and small suppliers in northern California for use in its Oregon mills.  Although these purchases averaged less than 1 percent of Roseburg's average annual consumption, the company discovered an economic advantage in the use of these lower grade species and integration of California timber became more significant in the 1980s.

Roseburg successfully bid for the K-C assets and purchased them for $251,916,330, or $141/MBF.  Roseburg retained the K-C organizational structure but modified and streamlined it to suit its own needs.  Within about 3 years, top management was replaced and the old K-C managers then reported to the new managers, who reported to Mr. Ford.  Such transitions were part of an evolutionary change in the K-C management reflecting Roseburg's intention to direct the policy and operating matters of their new company and to integrate the California and Oregon operations.  This was in keeping with the "hands-on" management style adopted by Mr. Ford which cut across all areas of the company.

In the initial years after the K-C purchase, petitioner's Oregon and California operations underwent an evolutionary transition toward integrated timber and administrative operations.  Petitioner undertook sophisticated reforestation and replanting procedures on the K-C lands, some, but not all, of which related exclusively to recovery of burned areas. Roseburg, however, was effectively forced to rest the K-C timberlands by virtue of the timber crash of the early 1980s. By the beginning of 1982, douglas fir prices had dropped to $125/MBF from $430/MBF in late 1980.

Roseburg was having great difficulty selling its products and was forced to curtail production at several Oregon plants.  At the same time, it had 1,200,000 MBF of unharvested, high-priced Government timber under contract that it was obligated to perform but could not operate without grave financial loss.

Petitioner harvested 29.1 MBF (long log scale) from its California fee lands from September 1979 through March 1983.

Despite the Oregon timber glut, K-C's lack of timber liquidity created a need to liquidate the Oregon stands in order to pay down the K-C purchase debt. In December 1982, Roseburg acquired a veneer plant in Weed, California. It began operating in mid-1983, and from then on most of the white fir produced or purchased in California has been made into veneer at Weed.

As part of its 1987-92 business plan, petitioner's plywood product group recommended the construction of an Anderson, California, plywood plant to increase petitioner's share of the sheathing market and to maintain cost efficient plywood's share of the panel market. Although petitioner contemplated the construction of a California plywood plant, it was not built because the supply of douglas fir and other Oregon timber began drying up in the latter 1980s and the California timber would be needed to run the Oregon facilities. Additionally, data showed that the western share of the national plywood market was declining. Petitioner's officers decided that it was unwise to add new capacity in such a market.

By 1985, the timber markets had recovered from the price crash of the early 1980s. However, by the late 1980s, the douglas fir supply was declining and the Federal timber supply was being threatened by environmental concerns over the northern spotted owl. These events, along with the excess manufacturing capacity in Oregon and the growing need to use the California wood and veneer at the Oregon plants, resulted in increased wood flow and product integration between the K-C and Oregon operations after fiscal year 1986. In years 1987 through 1989, approximately 50 percent of the veneer produced at Weed was transferred to Riddle and other Roseburg manufacturing facilities in Oregon, such as Dixonville and Coquille and Red Bluff in California. At the time of trial, it was estimated that 25-30 percent of petitioner's total white wood for use by the Riddle facilities came from California sources. Over the last few years, despite several strikes, 10 percent of petitioner's total veneer and logs came from California. California timber did not represent a significant percentage of petitioner's raw materials until the mid to late 1980s because the integration process of a large operation takes several years and because of adverse economic conditions.

Petitioner's Oregon and California timberlands straddle the douglas fir, mixed evergreen, mixed conifer, and pine-type forest cover zones and are sufficiently similar to be homogeneously grouped and part of an integrated product line within a logical management area.

2. *Analysis and Holding*

The ultimate question we must decide is purely factual. Each party offered qualified experts with respect to the appropriateness of petitioner's combination of its Oregon and California timberlands into a single block. Opinion evidence was offered concerning: (1) The botanical and geographical features of southern Oregon and northern California; (2) the meaning of timber industry terms, including logical management area; and (3) other subjects related to the foundation and standards for deciding whether petitioner's pooling of Oregon and California timberland is within the ambit of the statute and regulations. Although we found the expert opinion evidence to be helpful in understanding esoteric terminology and the scientific aspects of this issue, we did not find the expert testimony was conclusive with respect to the issue under consideration.[24]

The statute does not provide guidance concerning the pooling of timberland for purposes of the depletion deduction. The regulation provides broad guidelines within which we, as finder of facts, are able to decide whether petitioner is entitled to pool its Oregon and California timberland in a single block. We hold that petitioner's combination of the Oregon and California timberland falls within the ambit of section 1.611-3(d)(1), Income Tax Regs.

Some of the factors that persuaded and influenced our conclusion include:

(1) Mr. Ford's continuum of control prior to and during the period after the California acquisition. Although one could

---

[24]Numerous experts were offered by the parties in this case. While it was essential, as trier of fact, to have expertise with respect to concepts in which we are not trained or skilled, we believe that the parties in this case placed too much emphasis and importance on the testimony of experts. It seems that the parties have lost sight of the purpose that expert witnesses serve. Expert witnesses are not to be provided for the purpose of convincing the judge or trier of fact of an advocated position. Expert witnesses' sole purpose is to assist the trier of fact to understand the evidence. See Fed. R. Evid. 702; *Hamling v. United States,* 418 U.S. 87 (1974).

readily argue that the K-C timberlands were autonomous on a day-to-day operational basis, all parts or subdivisions of petitioner operated under the direct and omnipotent control of Mr. Ford and his Dillard, Oregon, nerve center for petitioner.

(2) The integration of northern California timber and timber products into the Oregon operation was motivated and necessitated by the diminishing timber supply and large increases in the price of timber in southern Oregon. One could argue that virtually no integration of California and Oregon timber or timber products occurred during the years before the Court, but integration did begin to occur in meaningful amounts immediately subsequent to the years in issue. We are also cognizant of the factors in this record which had an effect (caused delay in implementing integration), including the collapse of the timber market and problems concerning the Government cutting contracts. In this regard, the integration of a newly acquired timber operation of the magnitude of those under consideration could not occur instantaneously. The absence of meaningful integration in the setting of this case is not fatal to petitioner's choice to pool the newly acquired property with existing properties under circumstances where integration is contemplated and being implemented.

(3) There is varietal similarity of the trees in the area of southern Oregon and continuing on into northern California. Although the percentage of douglas fir tends to decrease in a southerly direction, the two areas are contiguous in most respects and are compatible, both in relative distances and types of trees.

(4) Petitioner, due to rising prices and decreasing supply in Oregon, had sought to and did find some sources of timber in northern California prior to the purchase of the K-C timberland. It is also important to note that petitioner had developed a method of utilizing lower cost and grade California "white wood" in the core of its laminated finished plywood products.

(5) Petitioner's policy of retaining several years' of timber inventory in the event that market conditions or cutting contracts were not sufficient to meet its needs also played a role in petitioner's use or failure to use California timberland. With the various conditions that had occurred during the period 1979 through 1983, petitioner began depleting its

Oregon inventory of timber and had the need to replenish its inventory of timber in line with its longstanding policy.

(6) The fact that it was tax advantageous to pool should not be detrimental to successful pooling under the regulations. The record in this case reflects that petitioner's pooling meets the regulatory guidelines and the fact that a tax advantage also may result is not ruinous to petitioner's attempt to pool. See *Gregory v. Helvering,* 293 U.S. 465 (1935).

## C. *Clear Reflection of Income*

Even though we have decided that petitioner's method was within the regulatory framework of section 1.611-3(d)(1), Income Tax Regs., respondent argues that she may change a permissible method in the setting of this case. It is respondent's position that petitioner's method does not clearly reflect income even though it fits within the regulatory scheme and, therefore, respondent did not abuse her discretion in requiring a change of method. Petitioner counters that compliance with a legislative regulation promulgated by respondent should be sufficient. Further, petitioner argues that, even if compliance with the regulation is not sufficient, its method clearly reflected income and respondent has abused her discretion in attempting to require a change.

We find this a most unusual and somewhat circuitous situation. Accounting issues for purposes of proper tax reporting are highly factual and there are few bright line rules by which various methods may be delineated and compared. Generally, we cannot look to financial accounting standards alone to determine if a taxpayer is appropriately reporting and in compliance with the Internal Revenue Code. This is so because reporting for tax purposes is ultimately governed by the statutes, regulations, and case law interpretations and not by the financial accounting standards. Here we confront a situation where we find petitioner has complied with the regulations (which are within the Secretary's ability to formulate and change). Moreover, these are legislative regulations in lieu of statutory provisions and not merely interpretations of the legislative pronouncements. The regulations are unambiguous, very broad, and permissive. Yet we are asked to decide whether, in spite of compliance, petitioner's method of reporting clearly reflects income. In

essence, we are asked by respondent to decide that the regulation may produce results which do not clearly reflect income. We suggest that the Secretary should seek to correct any perceived defects in the regulations under section 611 by appropriate amendment or modification.

Although we would feel justified in limiting our opinion to a finding that petitioner's compliance with the regulation should suffice, we also feel compelled to make inquiry into respondent's determination that petitioner's method does not clearly reflect income. Our compulsion is driven by pervasive authority ascribed to respondent regarding the use of accounting methods and the heavier than usual burden that is placed upon taxpayers to show that respondent has abused her discretion in these circumstances. Additionally, the regulations, although broad and permissive, also contain a reiteration of respondent's broad authority in the accounting area.

In this setting, petitioner's compliance with the regulations will be a factor which will be given appropriate weight in favor of petitioner in determining whether it has carried its burden of showing its method clearly reflected income and/or that respondent abused her discretion.

Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes the accounting treatment of a recurring incidence of expense such as depreciation. Sec. 1.446-1(a), Income Tax Regs. The term also includes the adjustment of any "material item" involving the proper time for the taking of a deduction. Sec. 1.446-1(e)(2)(ii)-(a), Income Tax Regs. If the method of accounting used by the taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b). In general, a method of accounting clearly reflects income when it results in accurately reported taxable income under a recognized method of accounting. *Wilkinson-Beane, Inc. v. Commissioner,* 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79; *Caldwell v. Commissioner,* 202 F.2d 112, 115 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated June 29, 1951; *Herberger v. Commissioner,* 195 F.2d 293

(9th Cir. 1952); *Rotolo v. Commissioner,* 88 T.C. 1500, 1513 (1987).[25]

Section 446 vests the Commissioner with broad discretion in determining whether a particular method of accounting clearly reflects income. *Cole v. Commissioner,* 586 F.2d 747 (9th Cir. 1978); *Capitol Federal Savings & Loan v. Commissioner,* 96 T.C. 204, 209 (1991); *Prabel v. Commissioner,* 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989). The Commissioner's determination is entitled to more than the usual presumption of correctness. *RECO Industries, Inc. v. Commissioner,* 83 T.C. 912, 920 (1984); *Peninsula Steel Products & Equip. v. Commissioner,* 78 T.C. 1029, 1044 (1982). Respondent's interpretation of the "clear-reflection standard [of section 446(b)] 'should not be interfered with unless clearly unlawful.'" *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532 (1979) (quoting *Lucas v. American Code Co.,* 280 U.S. 445, 449 (1930)). The taxpayer bears "a heavy burden of [proof]" to show that the Commissioner abused her discretion, and the Commissioner's determination "is not to be set aside unless shown to be 'plainly arbitrary.'" *Thor Power Tool Co. v. Commissioner, supra* at 532-533 (quoting *Lucas v. Structural Steel Co.,* 281 U.S. 264, 271 (1930)). See also *Prabel v. Commissioner, supra* at 1112; *Coors v. Commissioner,* 60 T.C. 368, 394 (1973), affd. 519 F.2d 1280 (10th Cir. 1975).

Although the Commissioner has broad discretion, she cannot require a taxpayer to change from an accounting method which clearly reflects income because the Commissioner considers an alternate method to more clearly reflect income. *Molsen v. Commissioner,* 85 T.C. 485, 498 (1985); *Peninsula Steel Products & Equip. v. Commissioner, supra* at 1045; *Fort Howard Paper Co. v. Commissioner,* 49 T.C. 275 (1967).[26] If a taxpayer's method of accounting is specifically authorized by

---

[25]But see *Osterloh v. Lucas,* 37 F.2d 277, 278-279 (9th Cir. 1930). That case included the statement that clear reflection of income means that books shall be fairly and honestly kept. It has been construed to mean that the clear reflection of income requirement is not absolute and that the Commissioner exceeds her authority when she insists that a taxpayer change from a method that has been fairly and consistently employed unless there has been some attempt to manipulate records or evade the payment of taxes. See *Asphalt Products Co. v. Commissioner,* 796 F.2d 843 (6th Cir. 1986), affg. and revg. T.C. Memo. 1984-208; see also *Bonaire Development Co. v. Commissioner,* 679 F.2d 159 (9th Cir. 1982), affg. 76 T.C. 789 (1981) (citing *Osterloh* principle in "clear reflection" situation involving prepayments); *Zaninovich v. Commissioner,* 616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978) (same as *Bonaire*).

[26]See also *Applied Communications, Inc. v. Commissioner,* T.C. Memo. 1989-469.

the Internal Revenue Code or the underlying regulations and has been applied on a consistent basis, respondent has not been allowed to arbitrarily require a change or reject the taxpayer's method. *Prabel v. Commissioner, supra* at 1112; *Hallmark Cards, Inc. v. Commissioner,* 90 T.C. 26, 31 (1988).[27]

Our inquiry is limited to the question of whether the accounting method in issue satisfies the clear reflection standard of the statute, and we do not decide whether a method is superior to other possible methods. *Auburn Packing Co. v. Commissioner,* 60 T.C. 794, 799-800 (1973). Whether a particular method of accounting clearly reflects income is a question of fact, and the issue must be decided on a case-by-case basis. *Capitol Federal Savings & Loan v. Commissioner, supra* at 210; *Peninsula Steel Products & Equip. Co. v. Commissioner, supra* at 1045.

With these general rules and principles as a backdrop, we proceed to consider the arguments of the parties. The parties have structured their arguments into several categories and, similarly to the question concerning timber blocks, they relied heavily upon expert witnesses.[28] We consider each argument separately.

---

[27]One commentator has noted that:

These judicial testimonials to the broad powers [concerning accounting methods] of the IRS must be qualified in one fundamental respect: An accounting method that is explicitly authorized or prescribed by Congress cannot be rejected even if the IRS, on a sober evaluation of its impact, concludes that it does not clearly reflect income. * * *

Except for this qualification, it is difficult to identify any authoritative standard by which to judge the propriety of an IRS determination that a taxpayer's accounting method does not "clearly reflect income." The statutory phrase is not only hopelessly vague but circular to boot, since the "income" that must be clearly reflected by the taxpayer's accounting method is *taxable* income, not financial, economic, or any other variety of income. In short, income is clearly reflected by an accounting method if the ultimate result of using the method is taxable income.

Another way of putting the point is that an accounting method clearly reflects income if (and only if) it treats relevant items (as respects inclusion or deduction from income and their temporal allocation) in the manner prescribed or permitted by the Code, regulations, cases and rulings. If the standards established by these *non*-accounting rules leave room for a choice between two or more ways of treating particular items, income is clearly reflected by an accounting method under which one of the permissible options is consistently chosen. * * *

[4 Bittker, Federal Taxation of Income, Estates, and Gifts, par. 105.1.6, at 105-18 (1981); fn. ref. omitted.]

[28]We found the testimony of the accounting experts to be helpful to our understanding of certain technical matters in the area of accounting and more specifically regarding accounting and the timber industry. In this connection, both parties offered well-qualified experts. Respondent's experts were more academically oriented and provided basic principles or pure accounting theory. On the other hand, petitioner's experts had background in timber industry accounting and practices.

## 1. *Clear Reflection—Composite vs. Separate Accounts*

Initially, petitioner, citing *Osterloh v. Lucas,* 37 F.2d 277, 278 (9th Cir. 1930), argues that the rule or standard for "clear reflection of income" established in the Ninth Circuit is that the taxpayer's books "shall be kept fairly and honestly; and when so kept they reflect the true income of the taxpayer within the meaning of the law." Respondent points out that the standard advanced by petitioner predates the pertinent regulations and has been superseded by pronouncements of the Supreme Court. Respondent argues that the standard for clear reflection requires "as much accuracy as standard methods of accounting practice permit," citing *Caldwell v. Commissioner,* 202 F.2d 112 (2d Cir. 1953). The standard of the *Caldwell* case would, if carried to its logical conclusion, prohibit the cash method of accounting for tax purposes.[29]

The parties place too much reliance upon *Osterloh* and *Caldwell* because those cases predate a substantial body of case law on the subject. Similarly, *Osterloh* and *Caldwell* were decided prior to the promulgation of the section 446 regulations under consideration and prior to the Supreme Court's opinion in *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522 (1979). Our reading of the cases reveals that the contemporary standard in the Ninth Circuit is not materially or specifically different from the standard in other circuits. Accordingly, we do not adopt what the parties perceive as a stricter or more lenient standard.

Additionally, in the circumstances of this case it is less significant, if significant at all, which standard is used to decide whether petitioner's method clearly reflects income. Here, petitioner is found to comply with the method of computing the depletion allowance which is set forth in the regulations. Usually, courts have found a taxpayer's method to clearly reflect income where the method is in compliance with the regulations. See *Prabel v. Commissioner,* 91 T.C. at 1112; *Hallmark Cards, Inc. v. Commissioner, supra* at 31. This should be especially so here, where we consider legislative

---

[29]By definition, the cash method may result in mismatching between expenses and income where expenses are paid in a year prior to the receipt of related income. Generally, the cash method is not permitted under accounting standards, whereas the cash method is permitted (for the years under consideration) for tax purposes.

regulations to which we pay greater deference, *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24-25 (1982); *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981), and which have been held to have the force and effect of law, *Batterton v. Francis,* 432 U.S. 416, 425 n.9 (1977).

We consider whether petitioner's composite method clearly reflects its income for tax purposes. On this point petitioner argues that its composite method is a moving historical average of cost which is in concert with section 1.611-3(b), Income Tax Regs., involving the annual cost of timber for computing the depletion unit. Petitioner argues that respondent's position, taken to its extreme, would require a matching of the cost of each tree harvested. Respondent contends that petitioner has misstated the issue. Respondent goes on to argue that the computational method of the regulation is intended to reach a "reasonable allowance" for depletion and that respondent has authority to readjust depletion accounts. Respondent denies that her approach requires specific tracing of each tree; instead, respondent argues that petitioner's "single account method produced a depletion allowance for fiscal years 1980 through 1983 which was $27,322,000 in excess of the cost of the timber harvested." Respondent argues that, on its face, petitioner's approach is not a "reasonable allowance".

Although respondent denies that she seeks specific tracing, her argument is solely concerned with the difference between the trees harvested and their cost. In this connection, petitioner points out that respondent does not have any problem with the pooling of all Oregon timberland, even though the cost element of the various parcels may drastically vary. It is also important to note, although not controlling as to this issue, that respondent's agent had requested[30] petitioner to combine more than 50 different parcels of Oregon timberland which had been acquired at different times and for varying prices. Some

---

[30]Respondent's agent had requested the change to a composite account prior to petitioner's acquisition of the K-C timberland. Additionally, we note that it appears that respondent's agent was interested in a composite account, among other possible reasons, for purposes of convenience. We reference the actions of respondent's agents in this opinion merely to reflect that they interpret the regulations as permitting large conglomerations of timberland into a single account irrespective of the possible variations in cost. We do not view respondent's agent's actions as binding upon respondent in the setting of this case.

of the Oregon timberland acquired after petitioner acquired the K-C timberland had comparable timber prices to those associated with the K-C timberland. We find respondent's argument concerning the cost disparity of the harvested trees to be flawed. Respondent agrees that if petitioner has formed a proper block under the regulations, then petitioner may use an average cost in accord with the computational regulations, even though there may be great disparity in the cost of the timber in the block. In this case, however, respondent makes the argument that even if the regulations are met, the disparity, per se, shows that the method used by petitioner does not clearly reflect income.

The basic concept of the regulation under consideration is to permit (for purposes of computing depletion) pooling or averaging of the cost factor of all timber in a block, irrespective of the cost and time of acquisition of the particular tree harvested. Respondent, in spite of the approach set forth in the regulation, argues that even if petitioner's method comports with the regulation, it does not clearly reflect income.

Respondent's argument also focuses upon the concept of matching. Respondent's argument seems to contain the principle that it would be permissible to combine timberland in a single account or block so long as the price of the timber was comparable. Moreover, it appears that respondent's approach would require the grouping of trees which approximated the average cost of timber acquired in the account so that there would not, in any particular year, be disparity between the selling price and cost factors.

Petitioner points out that its approach results in an even reporting pattern from year to year, whereas respondent's approach could result in large swings in the percentage profit from year to year.[31] Although this point is of more significance when considering concepts of financial reporting, it is of some significance in terms of the clear reflection of income.

We note that differences will occur in those years where timber with a cost that is more or less than the pool average

---

[31]By way of analogy, petitioner points out and we agree, that its method has similarities to the LIFO method. That method has as one of its basic premises the pooling of inventory which allows less room for extreme variation in income and less opportunity to manipulate income. Various experts have seen this feature as more effectively matching income as opposed to a system of specific matching.

is predominantly harvested. Other courts have considered similar occasional "blips" in the reporting pattern due to a particular accounting method. In some of those situations, despite the disparity in the year under consideration, the method was approved so long as the method was used consistently and generally, over the duration, yielded similar results as the method advanced by the Government. See *Bonaire Development Co. v. Commissioner,* 679 F.2d 159, 162 (9th Cir. 1982); *Zaninovich v. Commissioner,* 616 F.2d 429, 433 (9th Cir. 1980).[32]

Respondent's emphasis on the difference or disparity between market price and cost is not supported in the regulation. To the contrary, the regulation uses and, accordingly must favor, a moving average of the cost of timber in an account. By analogy, it would be reasonable to permit a business to reflect its current cost of raw materials or inventory in the contemporaneous cost of goods sold. This is especially so where the "inventory" or raw material grows and is replaced and/or acquired over a relatively long period of time. The basic nature of the timber industry involves a long-term regeneration period and is one of the major reasons that for tax purposes timber is treated more like a natural resource than agricultural crops.[33]

In this case, petitioner's longstanding policy was to acquire and hold timberland (as "insurance") for times when the market conditions required the use of the timber owned, rather than relying upon the market sources for supply. That policy could result in price disparity both between the costs of various parcels of timber and between market and cost which could be larger than in situations where the raw materials turn over frequently. Petitioner's use of its timberland was not solely to manipulate its tax burden. Petitioner only used its own timberland when confronted with reduced market supply, increased costs to carry the debt for purchasing additional timber (which was to be used for "insurance" and an integrated

---

[32]Although these cases involve prepayment of expenses, the cash and accrual methods of accounting are considered in connection with the possibility of distortion or clear reflection of income.

[33]See Pasewark & Bukowy, "Timber Taxation: The Effect of the Tax Reform Act of 1986", 36 Oil & Gas Tax Q. 266, 267 (1987); Howard, "Taxation of the Timber Industry Under I.R.C. Section 631(a) & (b)", 8 B.U.J. Tax Law 95, 96 (1990).

source for raw materials), and to assist in the shortfall caused by its excess bid over the market price of Government-leased timberland.

Although the matching of costs and revenues is a desired goal of financial accounting, it has not been cast as an overriding rule of tax accounting. See *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 603-604 (1986); *Eastman Kodak Co. v. United States,* 209 Ct. Cl. 365, 534 F.2d 252, 255-256 (1976); *Marquardt Corp. v. Commissioner,* 39 T.C. 443, 453-455 (1962). In the setting of this case the regulation does not require specific matching and is based on concepts of pooling to arrive at an average cost for purposes of computing the depletion allowance. This concept is analogously rooted to early cases holding that taxpayers are required to determine the average cost of each unit of timber cut, without regard to the wide differences in value of differing species. See *Tindle v. Commissioner,* 11 B.T.A. 1257 (1928); *Coburn Heirs, Inc. v. Commissioner,* 7 B.T.A. 365 (1927); *Boyne City Lumber Co. v. Commissioner,* 7 B.T.A. 36 (1927).

Respondent advanced here an argument similar to the one made in RECO *Industries, Inc. v. Commissioner,* 83 T.C. at 912, where a taxpayer used the long-term contract method of accounting, as permitted in the regulations and also used the LIFO inventory accounting convention to account for certain costs, including raw materials. The Government argued that the two methods used by the taxpayer were mutually exclusive and did not, together, clearly reflect income. The Government contended that the completed contract method required specific tracing of the costs of each contract, and therefore the pooling of cost under any inventory method was not permissible. In that setting we held that the matching concepts of the completed contract method did not require specific tracing of costs. *Id.* at 923. Respondent has, in essence, made the same or a substantially similar argument here and we find it no more persuasive in connection with the sections 446 and 611 regulations than we did in connection with the section 451 regulations in *RECO.*

2. *Does Petitioner's Approach Conform With Generally Accepted Accounting Practices (GAAP) and Timber Industry Practices*

Initially, petitioner argues, and respondent does not dispute, that petitioner met the conformity requirements of section 446(a), in that it uses the same single composite block or account for tax and financial purposes. Upon adoption of the single account for timber, petitioner utilized that approach for tax and financial purposes and has continued to do so through the time of trial. In addition to the K-C purchase in California, since 1979 petitioner has purchased Oregon timberland at similar prices per thousand board feet as the price of the K-C timberland.

Next, petitioner contends that its composite depletion method conforms with GAAP. In this connection, petitioner points out that upon the change to a composite method, petitioner's certified public accountants, Arthur Andersen & Co., approved their financial records and statements as complying with GAAP. Respondent collaterally attacks petitioner by arguing that the composite method is not the preferable method under GAAP. Respondent does not argue that the method or approach used by petitioner would not qualify under GAAP, but that a change from a "preferred method" to a less preferred one is not permitted. Accordingly, respondent reasons that petitioner's method did not comply with GAAP. In this regard, the essence of respondent's proffered experts' testimony was that accounting theory and GAAP would prefer specific identification of the cost of each tree. The pooling of timber with differing costs would be less preferred. Petitioner's experts, who had experience in the timber industry and its accounting practices, opined that various types of pooling were not uncommon in the industry and met GAAP standards.

Our analysis here is not to determine which method of accounting would be the most preferred or best method under GAAP. Our inquiry is to consider whether a particular method is one which would be acceptable or approved under GAAP. If a particular method is acceptable under GAAP, it may assist in our deciding whether the method meets the clear reflection standard. Here, petitioner's accountants approved its change from a separate to a composite account as meeting GAAP. Even if a method of accounting comports with generally accepted

accounting principles, it may not clearly reflect income, and therefore will not control for tax purposes. *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 538-544; *Sandor v. Commissioner,* 62 T.C. 469, 477 (1974), affd. 536 F.2d 874 (9th Cir. 1976).

Petitioner points out that various of its proffered expert witnesses provided specific examples or opinions of industry practice(s) comparable to petitioner's composite approach. Respondent argues that no factual evidence is contained in the record which supports or explains the facts upon which the experts' examples or opinions were based. Accordingly, respondent argues that we should not consider or give weight to statements of the experts as to industry practice.

We agree with respondent that the record does not contain factual evidence supporting petitioner's experts' statements and opinions concerning industry practice. Respondent's position on this point, however, goes to the probative value of the experts' statements and not to their admissibility. Under Rules 702 and 703, Federal Rules of Evidence, expert opinions may be based upon hearsay and material not contained in the record. It may also be based upon their personal knowledge and observations. Here, certain of petitioner's experts had substantial experience in the timber industry. Based upon their experience and knowledge, they testified and opined that petitioner's composite account practices comported with industry practices. Examples were given of multiple State accounts or blocks and of large companies using composite blocks or accounts. We find that petitioner's experts' uncontradicted opinions show that petitioner's approach was not unique in the timber industry and that it comported with industry practices. We also note that one of respondent's agents was also aware of similar industry practices.

Accordingly, we hold that petitioner's combination of its Oregon and California timberland into a single account reasonably and clearly reflected income. Generally, our discussion of this subject would have concluded if we have found, as we did here, that a taxpayer's method of accounting clearly reflects income. In this case, however, respondent argues that she may require a taxpayer to readjust its timber accounts in any event. Accordingly, we go on to consider respondent's position.

## D. *Respondent's Discretion to Change a Permissible Method*

Respondent's first argument is that petitioner's composite account does not comport with the section 611 regulations. Should this argument fail, respondent contends that, even if petitioner's method comports with the regulations, it does not clearly reflect income because it fails to match timber used with the associated costs. Finally, and failing all other approaches, respondent argues that she has, in any event, the discretion to change petitioner's timber accounts under section 1.611-3(d)(5), Income Tax Regs., which provides:

> For good and substantial reasons satisfactory to the district director, or as required by the district director on audit, the timber or the land accounts may be readjusted by dividing individual accounts, by combining two or more accounts, or by dividing and recombining accounts.[34]

Respondent views this authority as exercisable without prerequisite and "that the widest possible latitude should be accorded to the district director in exercising [this] authority". In support of this interpretation of the breadth of this regulation, respondent relies upon the Court of Claims opinion in *Westvaco Corp. v. United States,* 225 Ct. Cl. 436, 639 F.2d 700 (1980). In that case, the court in describing the district director's authority, used the term "demand" as follows:

> *Paragraph (d)(5) provides for further division or recombining of accounts for good and substantial reasons* upon approval or demand *by the district director.*

*Id.* at 714. Respondent, in the interpretation of that case, has chosen to focus upon the term "demand" as reflecting an unfettered or unrestrained discretion. Respondent, however, seems to ignore the "for good and substantial reasons" language which precedes the use of the term "demand" by the Court of Claims. Finally, respondent contends that petitioner

---

[34]On brief, respondent describes the order of events and scenario she believes are inherent in the authority described in the regulations as follows:

The flexibility in the timber depletion regulations is not unlimited. Once the taxpayer selects his timber depletion accounts, they are subject to audit by the district director. The flexibility initially given to the taxpayer in selecting depletion accounts may be checked during the audit of those accounts. Treas. Reg. [sec.] 1.611-3(d)(5) gives the district director discretion to require a readjustment of timber accounts. Pursuant to this authority, he may divide individual accounts, combine two or more accounts or divide and recombine accounts.

must show that respondent acted "arbitrarily, capriciously or without sound basis in fact" in order to show that respondent abused her discretion in requiring that Oregon and California timberland be in separate accounts for purposes of the depletion allowance. Respondent contends that the standard for our review here is the same as was used in connection with section 6661(c) (repealed by the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2400) and set forth in *Mailman v. Commissioner,* 91 T.C. 1079, 1084 (1988).

Petitioner argues that respondent does not have unfettered authority to require a change in a depletion method. More specifically, petitioner argues that respondent has no authority to disturb accounting methods that conform with the regulations. Petitioner explains the rationale for its argument as follows:

The Commissioner has no authority to disturb an accounting method that conforms with the regulations. If the Secretary does not like the regulations, he has plenary authority under section 611 of the Code to revise them. Section 611 directs the Secretary to issue regulations that provide a "reasonable allowance" for depletion. The Secretary has done that, and Roseburg's use of an approach which is consistent with the regulations must be regarded as "reasonable." Until the Secretary changes the regulations, the Commissioner has no authority under *Thor* [*Power Tool Co. v. Commissioner,* 439 U.S. 522 (1979)] to require Roseburg to abandon the regulations and compute its depletion in another way. *Hallmark Cards,* 90 T.C. 26 (1988); *Orange & Rockland Utilities Inc. v. Commissioner,* 86 T.C. 199 (1986); *Van Raden,* 71 T.C. 1083 (1979).

Although we do not adopt petitioner's rationale completely, we agree that respondent should not be able to arbitrarily cause taxpayers to change a method which is permitted under the regulation unless that method does not clearly reflect income. The Supreme Court in *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522 (1979), considered and evaluated the standard for deciding whether the Commissioner has abused her discretion in connection with the change of an accounting method. In considering *Thor* earlier in this opinion we held that although respondent has broad discretion, she cannot require a taxpayer to change from an accounting method which clearly reflects income because the Commissioner considers an alternate method to more clearly reflect income.

In a post-*Thor* environment respondent has been found to have appropriately exercised her discretion where a taxpayer's method of accounting conflicted with the regulations. See, e.g., *Homes by Ayres v. Commissioner*, 795 F.2d 832 (9th Cir. 1986); *Tog Shop, Inc. v. United States*, 721 F. Supp. 300 (M.D. Ga. 1989). Similarly, where a taxpayer's method was contrary to accounting principles, did not conform to industry practice, was not used for tax and financial reporting, and/or was not reliable, respondent was found to have appropriately exercised her discretion. See, e.g., *American Fletcher Corp. v. United States*, 832 F.2d 436 (7th Cir. 1987); *Applied Communications v. Commissioner*, T.C. Memo. 1989-469.

In this case, petitioner complied with the regulations and was in conformity with accounting principles, industry practice, and other standards considered in this area. Respondent argues that the method that she determined would more clearly reflect income. Respondent's focus is upon the disparity between the method she determined and the one used by petitioner. That focus, in the setting of this case, is an insufficient reason for the imposition of a differing method determined by respondent. The best method is not necessarily the one which produces the most tax in a particular year. If, as here, a taxpayer's method is consistently applied and clearly reflects income, we will not sustain respondent's determination merely because it produces more income tax for the taxable year under consideration.[35] The inability to cause significant integration of California timber into its operation in early years was without the control of petitioner. The startup curve

---

[35]As petitioner harvests trees from the K-C acquisition, its costs will be understated and, necessarily, more income will result. The essence of the question we answer has more to do with timing than anything else. Petitioner is entitled to utilize only as much cost as had actually been incurred in the acquisition of the timber. There is no question here about trees which are not yet merchantable, because the depletion allowance may only be attributable to trees of "merchantable" size. Sec. 1.611-3(d)(3), Income Tax Regs.

The question is whether that cost should be reflected based upon the average cost of timber or the specific cost of each unit of timber. Complicating this formulation is the process of grouping the timberland into logical or rational pools. As one expands from specifically assigning costs to each tree, stand of trees, logical management area, etc., the effect is to move to an average, rather than specific cost. Although an average cost may, in theory, produce less income in years where low-cost trees are harvested, the opposite is true where high-cost trees are harvested. Moreover, because the cost is based on an average, a consistently used average method over time will most closely approximate the average tree being harvested. Finally, the use of an average cost approach, over the long run, should result in less motivation to harvest a particular tree for tax reasons, rather than good business and silvicultural reasons.

and impediments in the marketplace and economy caused the delay in integration and the disparity upon which respondent focuses. Disparity in amount is not, per se, necessarily indicative of a failure to clearly reflect income. This is especially true where, as here, the result will yield more evenly and fairly reported results.

Finally, there is a substantial body of law regarding the judicial review of agency discretion and "agencies are not required, at the risk of invalidation of their actions, to follow all their rules". *United States v. Caceres,* 440 U.S. 741, 754 n.18 (1979); *Capitol Federal Savings & Loan v. Commissioner,* 96 T.C. 204, 216 (1991). In this connection, agencies are usually not bound by general statements of policy and rules governing internal administrative matters. *Capitol Federal Savings & Loan v. Commissioner, supra* at 216-217 (and cases cited therein). On the other hand, and more relevant to our circumstances, agencies are generally bound by regulations having the force and effect of law. *Id.* Although the regulations under consideration also contain reference to respondent's authority to question a taxpayer's method, we find that petitioner has shown that respondent abused her discretion in determining that petitioner was not entitled to include its California timberland in its pool for purposes of computing depletion.

To reflect the foregoing and due to concessions of the parties,

*Decision will be entered under Rule 155.*