T.C. Memo. 2002-103

UNITED STATES TAX COURT

PRUDENTIAL OVERALL SUPPLY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4425-00, 8875-00.      Filed April 23, 2002.

Jasper G. Taylor III, Nancy T. Bowen, Jay M. Chadha, and
Richard L. Hunn, for petitioner.

J. Scott Hargis and Kenneth C. Peterson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies in
petitioner's Federal income taxes as follows:

Docket No. 4425-00

| Year | Deficiency |
|------|------------|
| 1993 | $4,046,998 |
| 1994 | 2,093,171 |
| 1995 | 822,274 |

1996            719,096

Docket No. 8875-00

| Year | Deficiency |
|------|------------|
| 1997 | $665,458 |
| 1998 | 1,036,011 |

After concessions by the parties, the issue remaining for decision is whether it was an abuse of discretion, under section 446(b), to require petitioner to capitalize and depreciate the cost of the garments and dust control items used in petitioner's industrial laundry business.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Unless otherwise indicated, the facts and events contained herein occurred during the years in issue.

Petitioner is a California corporation with its principal place of business in Irvine, California. Petitioner is in the industrial laundry business, which provides, launders, repairs and maintains, and services garments worn by the employees of petitioner's customers. Petitioner offers industrial garments and dust control items at about 20 locations in four States and

offers clean room garments at five locations in four States. Petitioner has approximately 40,000 customers and, at any point in time, has millions of garments (industrial garments and clean room garments) and dust control items in service.

Petitioner's principal source of revenue was from customer payments that were received for rendering industrial laundry services. The principal cost of furnishing petitioner's industrial laundry service was labor. Other costs included supplies for cleaning and merchandise costs. The price of petitioner's service included consulting as to the proper type of items, measuring, picking up, cleaning, mending, size changes, and delivery. The amount charged to the customer was based on the size of the account, estimated turnover, "under wash", projected wear, and competitive factors.

Industrial Garments

Petitioner provided industrial garments that included shirts, pants, smocks, aprons, jumpsuits, coveralls, protective cover garments, and "completed-to-wear" garments. Petitioner manufactured some of the industrial garments that it provided to its customers and purchased the remainder from manufacturers. Industrial garments are worn by persons working in the construction industries, repair services, factories, gas stations, grocery stores, and retail establishments.

Generally, industrial garments have a company logo and/or a company name on the garment. Typically, garments were also measured to fit the customer's employees. In 1968, petitioner switched from exclusively providing 100-percent cotton fabric garments to also providing a 65-percent polyester and 35-percent cotton blend fabric garments. About 60 to 65 percent of the industrial garments involved in this case are made up of the 65-percent polyester and 35-percent cotton blend fabric.

Clean Room Garments

Petitioner serviced manufacturing industries such as electronic manufacturers, semiconductor manufacturers, and disk drive manufacturers. In a manufacturing type environment, the clean room garment is designed to keep the particulate matter from contaminating the product. Petitioner also serviced medical, aerospace, pharmaceutical, and biomedical industries. In these industries, the clean room garment is designed to protect the worker from the product or hazardous chemicals.

Petitioner provided to its customers clean room garments that included highly specialized polyester hoods, coveralls, frocks, boots, smocks, lab coats, gloves, and polyurethane wipers. Customers that used clean room garments required garments that were clean, that were free from particulation, and that met safety requirements. Petitioner's clean room facilities removed soil particles not visible to the human eye, sterilized

garments using a radiation process, and dissipated the electrostatic buildup from garments.

Clean room garments were made according to the customers' specifications, such as the fabric used and the style of the garment. Each garment was cut to the specific size of the employee. Some of the garments were personalized with logos or emblems that were sewn or embroidered directly onto the garment.

Dust Control Items

Dust control items that were provided by petitioner included towels, linens, mats, and mops. Petitioner did not manufacture any dust control items. Dust control items were not necessarily returned to the same customer for reuse.

Towels that were provided by petitioner included shop towels, painter's towels, machinist's towels, food towels, bar mops, dish towels, glass towels, and huck towels. Linens that were provided by petitioner included massage towels, bath towels, and roll towels. Towels that start out as the same item were used in different categories. For example, towels could be used in food service and restaurants to clean tables or to clean grills, used in gas stations to clean windshields, or used by the printing industry to wipe down equipment. Towels were used by different types of customers as the condition deteriorated. Used towels, no longer in a condition to continue in service in one

towel category, were dyed and placed in service in a different towel category.

Petitioner provided mats that were either rubber-backed or cotton. On several occasions, mats were withdrawn from service after a couple of months for defects in manufacture such as side seam tears that made the mats unsafe and fibers from the mats that shed onto customers' floors.

Garments Placed in Service

Petitioner's policy was to place a tag inside each garment that it manufactured. The information provided on the tag included petitioner's name and logo, the fabric from which the garment was made, and the month and year that the garment was manufactured.

The placing of garments and dust control items in service was a common and frequent event in petitioner's business. At the time that a garment was placed in service, petitioner's policy was to insert another tag inside the garment that identified the month and year that the garment was placed in service, the customer number, the employee number of the person who was to wear the garment, and the truck delivery route. Petitioner began using bar code tags on some of its clean room garments during either 1992 or 1993 and on some of its industrial garments during late 1997. If a prior tag fell off, was illegible from wear and

tear, or a route change occurred, the tag would be replaced and bear the placed-in-service date from the original tag.

Petitioner maintained a garment tracking system. The garment control list was used by delivery personnel to quantify and verify the number of garments being picked up, processed, and delivered. The garment control list did not provide information on what happened to particular garments other than the driver's notes regarding items that were damaged. Even for garments with bar codes, the data for the garment tracking system were incomplete because some bar codes fell off, were illegible, or were mutilated.

Garments Withdrawn From Service

The removal of garments and dust control items from service was a continuous process. Garments and dust control items could be removed from service for a physical reason or for a reason other than physical stress to the garment.

Industrial garments were withdrawn from service for physical reasons that included garments with paint, torn garments, garments with cuffs cut off, pants cut into shorts, sleeves cut off shirts, garments with pockets ripped off, and garments with graffiti. Certain industries such as roofers, carpet layers, plumbers, and welders were very hard on the garments and garments were often heavily soiled and stained. The heavily soiled and stained garments were washed in harsh chemicals, in extremely hot

water, in large 800-pound loads, and were dried at hot temperatures. This laundering process would remove most of the stains, but the process was detrimental to the fabric.

Clean room garments were removed from service and replaced for physical reasons such as: (1) The garment did not meet the customer's requirements; (2) the garment had some physical damage or defect that was caused by the customer; (3) the condition of the garment was deteriorated beyond the normal wear and tear; (4) the garment failed to meet quality assurance testing; or (5) the garment had a manufacturing defect. Also, garments were destroyed by the customer for safety reasons when biohazardous chemicals were spilled on them.

Reasons, other than physical stress to the garment, that a garment would be removed from service include: (1) A decrease in a customer's manpower, (2) a customer's going out of business or becoming bankrupt, (3) normal turnover in a customer's employees, (4) a change in an employee's size, (5) a change in a customer's identifying color or image, (6) a canceled contract or the contract term expired, (7) a customer changed to a newer fabric, or (8) a customer's requirements changed.

A garment that was taken out of service was usually sent to one of petitioner's supply rooms for evaluation. Damaged garments might be repaired and placed back in service or could be used pursuant to another contract. Generally, garments withdrawn

from service were difficult to reuse because customers preferred new garments and did not want to wear used clothes. Garments that were withdrawn from service were: (1) Donated to charity, (2) sold for scrap, (3) discarded, or (4) stored in petitioner's stockroom.

Service Rental Agreement

Petitioner used two standard form contracts, both titled "Service Rental Agreement", when negotiating its services to furnish, clean, pick up, and deliver garments and dust control items with customers.

The Service Rental Agreements included a replacement provision that charged the customer for damages. The contract stated:

> 3. REPLACEMENT: In the event of damage to wearing apparel by CUSTOMER, reasonable wear excepted, CUSTOMER shall pay PRUDENTIAL's replacement value less depreciation of 2% of the replacement value for each month in service. Total depreciation is not to exceed 80% of replacement value. * * *

Petitioner's management believed that the replacement provision provided customers with an incentive to care for the items and deterred customers from misusing the items.

The Service Rental Agreements set the term of the contract at 60 months. The length of a clean room garment contract was generally 60 months. The typical length of an industrial garment contract was 36 months.

The terms of an actual agreement could vary from the Service Rental Agreement. Terms that were most frequently changed were the length of the agreement, the right to cancellation, the replacement charges, and/or the terms of payment. Quite frequently, the contract would not be used with petitioner's very large customers, who instead used their own legal counsel to draft and negotiate the terms of the contract.

Laboratory Tests

Petitioner had several testing laboratories at which petitioner tested its fabrics and garments. Fabric tests were conducted by petitioner to compare fabrics and to qualify new fabrics for use in petitioner's garments. The tests performed by petitioner's quality assurance test laboratories included wash-and-wear cycle tests, fabric tests, body box tests, and wash tests. An "ASTM" test and a "Helmke Drum" test were designed to measure particulate contamination present in a garment. Other tests that were performed were an abrasion test, a moisture vapor transmission test, and specific tests for certain fabrics used in medical markets.

Subsequent to the years in issue, petitioner made representations on its Web site regarding the performance characteristics of the fabrics that it used in its clean room garments. In particular, petitioner represented that garments made of certain fabrics were tested in up to 100 wash-and-wear

test cycles "or the equivalent of up to four (4) years of garment service life".

Financial and Tax Accounting

Petitioner maintained its books and records using the accrual method of accounting for financial accounting and tax accounting purposes. Petitioner's fiscal year ended on the last full business week of the calendar year, and petitioner's tax year ended on December 31.

Petitioner's audited financial statements explain the method that petitioner used to account for the cost of its merchandise as follows:

> The Company charges to expense the cost of manufactured and purchased garments and other rental merchandise when placed in service. Purchased garments are included in prepaid expenses * * *.

Petitioner used this method consistently from year to year and for more than 30 years.

Prior Tax Audits

In 1968, respondent conducted an examination of petitioner's Federal income tax returns for 1966 and 1967 and required that petitioner change the method by which the cost of the garments and dust control items was deducted. Respondent required petitioner to treat one-half of the cost of purchases during the month of December as inventory on hand at the end of the year. This method was meant to approximate a deduction for when items are placed in service rather than when purchased or manufactured.

Petitioner used this method for purposes of preparing its Federal income tax returns for 1968 through the years in issue.

Respondent conducted audits of petitioner's Federal income tax returns for 1971, 1972, 1974, 1975, 1991, and 1992, and no change or adjustment was made with respect to petitioner's method of deducting the cost of garments and dust control items when placed in service. During the audit for the years in issue, an employee of petitioner stated to the auditing agent, in the words of the auditing agent:

> they didn't want any contract to be less than five years, because the cost of these garments was so much, and the materials lasted so long that they--and they were all made to specific order, that if you stopped your contract, they had nothing--they had nowhere to put these uniforms, because it was made to each client. * * *

Another employee stated to the auditing agent that, "with just a little repair", some of the mats could last more than 10 years.

Notices of Deficiency

In the notices of deficiency, respondent "determined that * * * [petitioner] used an unallowable method to value * * * inventory and to compute * * * Cost of Goods Sold". The deficiency amounts calculated by respondent reflected a determination that the industrial garments had a useful life of between 2 and 4 years and were 3-year class property; the clean room garments had a useful life of between 4 and 10 years and were 5-year class property; the dust control items, other than

towels, had a useful life of between 4 and 10 years and were 5-year class property; and the towels had a useful life of more than 1 year but less than 4 years and were 3-year class property.

Respondent's adjustment computation schedules explain the adjustments made by respondent:

Since it has been determined that the taxpayer is not in the business of selling goods, but rather is in the business of renting assets, the assets, the Cost of Goods Sold will be adjusted to reflect this. The cost of acquiring the rental assets will be capitalized and depreciated in accordance with Section 168. The basis of goods sold or disposed of will be currently deductible. Any period costs will also be allowed as a current deduction.

*     *     *     *     *     *     *

In order to determine the amount of assets that were 3 year assets (Garments) from assets which are five year assets (mops, mats) of the total inventory claimed we have done an allocation.

Taking the total Purchases for * * * [the year], and noting the % [percentage] that was garments, mats, etc. we have determined the allocation percentage.

Respondent's adjustment computation schedules also briefly describe respondent's basis for determining the useful lives of the garments and dust control items:

Taking into consideration only the assets that are being put into service during the taxable year, and the useful life to the corporation, we have determined that there is not one class life, but two, garments, which are subjected to washing, wear and tear, obsolescence, change in customer size, etc have a life of 3 years, as substantially shown via the three year contracts issued.

However, per the testimony of the plant manager the clean room garments are expected to last at least five

years. Verified by the normal five year contract the garments * * * [are] priced so that the expense of obtaining the rental is recovered with a five year rental program.

Dust control items, consisting of mats and mops, have also been shown to have a life of five years. * * *

OPINION

Although not explicitly stated in the notice of deficiency, the deficiency amounts reflect adjustments that would require petitioner to capitalize the cost of the garments and dust control items that it used in its industrial laundry business and to depreciate the cost of the items over the useful lives that were determined by respondent.

The issue presented is whether it was an abuse of respondent's discretion, under section 446(b), to require petitioner to change its method of accounting.

The term "methods of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item. Sec. 1.446-1(a)(1), Income Tax Regs. A correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets that had been consistently treated as an expense involves the question of the proper timing of an item and is to be treated as a change in method of accounting. Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. Thus, respondent's determination that petitioner must capitalize the cost of the garments and dust control items

reflects the exercise of the broad discretion of the Commissioner under section 446(b) to impose a change in petitioner's method of accounting.

Section 446 provides:

SEC. 446.  GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

Section 446(b) vests the Commissioner with broad discretion in determining whether a particular method of accounting clearly reflects income.  See Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 788 (11th Cir. 1984); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995); RLC Indus. Co. v. Commissioner, 98 T.C. 457, 491 (1992), affd. 58 F.3d 413 (9th Cir. 1995).

In general, a method of accounting clearly reflects income when it results in accurately reported taxable income under a recognized method of accounting.  RLC Indus. Co. v. Commissioner, supra at 490.  A method of accounting will ordinarily be regarded as clearly reflecting income when the method reflects the

consistent application of generally accepted accounting principles in a particular trade or business, is in accordance with accepted conditions or practices in that trade or business, and provides that all items of gross income and expenses are treated consistently from year to year. Sec. 1.446-1(a)(2), Income Tax Regs. A taxpayer's method of accounting is generally acceptable where the method is in compliance with the underlying regulations of the Code. Sec. 1.446-1(c)(1)(ii)(C), Income Tax Regs.; see, e.g., Frysinger v. Commissioner, 645 F.2d 523 (5th Cir. 1981), affg. T.C. Memo. 1980-89; RLC Indus. Co. v. Commissioner, supra; Van Raden v. Commissioner, 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981). "[I]f the taxpayer succeeds in showing that the method it chose clearly reflects its income, then respondent does not have discretion to disturb that choice." Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. 1029, 1045 (1982); see Photo-Sonics, Inc. v. Commissioner, 357 F.2d 656, 658 n.1 (9th Cir. 1966), affg. 42 T.C. 926 (1964); Bay State Gas Co. v. Commissioner, 75 T.C. 410, 417, 423 (1980), affd. 689 F.2d 1 (1st Cir. 1982). Petitioner maintains that its method of expensing the cost of the garments and dust control items when placed in service clearly reflects the income and expenses of its industrial laundry business because the method reflects the consistent application of generally accepted accounting principles, the method is an accepted practice in the

industrial laundry business, the method treats the expense of garments and dust control items consistently from year to year, and the method uses a reasonable approximation of useful life that is provided for in the regulations of the Code. Consequently, petitioner argues that it was an abuse of respondent's discretion to require petitioner to change its method of accounting.

Respondent contends that petitioner's method of accounting for the cost of the garments and dust control items is not in conformance with the Code or regulations and that the capitalization and depreciation of garments and dust control items will clearly reflect the income of petitioner's business. Respondent maintains that the useful life of garments and dust control items used in petitioner's business is greater than a year, and, thus, the cost of the items placed in service should be capitalized under section 263 and depreciated over the useful life of each asset class.

Section 263 prohibits deductions for capital expenditures. See also sec. 1.263(a)-1(a), Income Tax Regs. Capital expenditures include the cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year. Sec. 1.263(a)-2(a), Income Tax Regs.

Petitioner argues that its garments and dust control items are materials and supplies that are consumed within the year that they are placed in service, and thus the cost of these items are ordinary and necessary to the operation of its industrial laundry business and are properly expensed when placed in service under section 162 and section 1.162-3, Income Tax Regs.

Supplies used in the taxpayer's trade or business are among the items included in business expenses. Sec. 1.162-1(a), Income Tax Regs. Section 1.162-3, Income Tax Regs., provides that taxpayers carrying materials and supplies on hand should include in expenses the charge for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made.

Petitioner argues, in the alternative, that, even if required to capitalize the cost of the garments and dust control items under section 263, the useful life of the garments and dust control items was less than 1 year or not substantially in excess of 1 year and would be fully depreciable in the year placed in service.

Section 167(a) generally allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business. Any reasonable and consistently applied method of computing depreciation may be used or continued in use. Sec.

1.167(b)-0(a), Income Tax Regs.  The taxpayer need only make a reasonable approximation of the useful life of an asset that bears a reasonable relationship to the taxpayer's business practice; absolute certainty is not required.  Ames v. Commissioner, 626 F.2d 693, 695-696 (9th Cir. 1980), affg. T.C. Memo. 1977-249; Banc One Corp. v. Commissioner, 84 T.C. 476, 499 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987).  The useful life, not the physical life, is relevant. Ames v. Commissioner, supra at 695-696; Elec. & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1334 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).  The useful life of an asset has been defined as the "period for which it may reasonably be expected to be employed in the taxpayer's business."  Massey Motors, Inc. v. United States, 364 U.S. 92, 107 (1960); Hertz Corp. v. United States, 364 U.S. 122, 124 (1960); see also sec. 1.167(a)-1(b), Income Tax Regs.  In petitioner's business, the useful life of an item begins when the item is placed in service and ends when the item is withdrawn from service, regardless of the physical condition of the item.

"[T]he determination of the useful life of an asset and the other estimates utilized in computing depreciation must be based upon facts existing as of the close of the taxable year in issue."  Banc One Corp. v. Commissioner, supra at 499-500; see also sec. 1.167(b)-0(a), Income Tax Regs.  Some factors to

consider in determining estimated useful life include exhaustion; wear and tear or decline from natural causes; obsolescence; economic changes; inventions; current developments in the industry and the taxpayer's trade or business; climatic or other local conditions peculiar to the trade or business; and the taxpayer's policy as to repairs, renewals, and replacements. Sec. 167; sec. 1.167(a)-1(b), Income Tax Regs.

The taxpayer is responsible for establishing the reasonableness of the deduction for depreciation.  Sec. 1.167(b)-0(a), Income Tax Regs.  Generally, depreciation deductions so claimed will be changed only where there is a clear and convincing basis for a change.  Id.

The parties disagree on the useful life of the garments and dust control items.  Petitioner contends that it made a reasonable approximation of the useful life of its garments and dust control items based on its business practices and that there was no clear and convincing basis for a redetermination of the useful life by respondent.  Petitioner approximated that the useful life of its garments and dust control items was less than 1 year or not substantially in excess of 1 year.

The useful life determined by respondent was 4 to 10 years for mats, 4 to 10 years for mops, 1 to 4 years for towels, 2 to 4 years for industrial garments, and 4 to 10 years for clean room garments.  Respondent primarily relies on an expert report and

the terms in petitioner's typical Service Rental Agreement to support the redetermination of the useful life.

Based on the evidence and the facts known to petitioner's management during the years in issue, we are persuaded that petitioner did make a reasonable approximation of the useful life of the garments and dust control items and that the approximation was based on a reasonable relation to its business practice.  The following factors support petitioner's approximation of the useful life of its garments and dust control items:  (1) The placing of garments and dust control items in service was a common and frequent event in petitioner's business; (2) the value of the garments became negligible when placed in service because the garments were, generally, custom designed, measured to fit customers' employees, and marked with a company's name or logo; (3) the removal of garments and dust control items from service was a continuous process in petitioner's business; (4) garments and dust control items were withdrawn from service for various physical reasons; (5) industrial garments were subject to continual wear and tear from the harsh and hazardous environments in which they were worn and from the laundering process; (6) clean room garments were withdrawn from service if, through wear and tear, defect, or damage, they no longer met a customer's strict quality control requirements; (7) garments and dust control items were withdrawn from service for reasons not related

to exhaustion of their physical life such as obsolescence, contract cancellations or terminations, employee turnover, change in an employee's size, and customer design changes; and (8) garments and dust control items that were removed from service for reasons other than physical damage were difficult to reuse in petitioner's business.

Respondent maintains that petitioner has produced no quantifiable evidence and has had several years to document the correctness of its approximations. Respondent argues: (1) Petitioner had sufficient time to produce its own study that would determine the useful life of the garments and dust control items and should not rely on industry experience, (2) petitioner labeled its garments and maintained a garment tracking system and should be able to document the useful life of the garments placed in service without an additional record keeping burden, (3) petitioner had test laboratories in which to perform tests to determine the useful life of the garments and dust control items, (4) petitioner represented to its customers in the years subsequent to the years in service that certain clean room garments could have a service life of up to 4 years, and (5) the life of the 65-percent polyester and 35-percent cotton garments was longer than the life of the 100-percent cotton garments used in 1968.

Petitioner was not required to determine with absolute certainty the useful life of the garments and dust control items; rather, petitioner was permitted to make reasonable approximations of the useful life of the items based on a reasonable relationship to petitioner's business practices.

Respondent's arguments do not overcome petitioner's evidence that supported the reasonableness of its methodology. Petitioner's garment tracking system was used to track the processing of garments, but it did not provide information on the service life of each garment.  Petitioner's witness testified that the tracking of millions of garments and dust control items in service would not have been administratively or economically feasible.  Any laboratory test, whether or not conducted, would have produced results that documented the durability of a fabric or garment, and, thus, the test results would reflect the physical life of the garment, rather than the useful life. Petitioner's representations that certain clean room garments could have a service life of up to 4 years were made subsequent to the years in issue, see Banc One Corp. v. Commissioner, 84 T.C. at 499-500, and do not take into account the nonphysical events that caused a garment to be withdrawn from service.

As to petitioner's use of the 65-percent polyester and 35-percent cotton garments, petitioner's industry expert explained that the industry did not use the 65-percent polyester

and 35-percent cotton garment for its durability.  Petitioner's corporate publication explains that its switch to a 65-percent polyester and 35-percent cotton blend fabric allowed it to provide colorful and attractive apparel.  Again, the physical life of the garment does not determine the useful life of the garment.  Ames v. Commissioner, 626 F.2d 693, 695-696 (9th Cir. 1980), affg. T.C. Memo. 1977-249; Elec. & Neon, Inc. v. Commissioner, 56 T.C. at 1334.

Respondent relies on his expert report that concludes that the "average service life" of petitioner's garments and dust control items is greater than 1 year.  The conclusions are based on a random statistical sample consisting of garments and dust control items examined during a visit to petitioner's facilities in 2001.  The population for the statistical sample consisted of all items located at three of petitioner's facilities on the day of the visit.  The statistical sample taken was based on the assumption that the ages of the items within each facility were randomly shuffled.  Items missing tags or tags with dates that were too worn to read were removed from the sample.

Using the data collected, estimates of the mean and median age were determined for each category based on a 95-percent confidence interval.  The median age of the sample of mats from the active area of the Cerritos facility was 641 days.  The median age of the sample of industrial garments from the active

area of the Carson facility was 562 days. The median age of the sample of clean room garments from the Bandini Boulevard facility was 422.5 days.

Respondent's expert report is unreliable and not useful because the conclusions reflect an average physical age, rather than the average service life (i.e., useful life). The statistical sample used the manufacture date of the items, rather than the placed-in-service date. The general comments to respondent's expert report state:

> Some items * * * had two labels with different dates. One was assumed to be the date at which the item was manufactured, and the other the date at which the item was placed in service for the current contract. It was sometimes difficult to tell which was which. This analysis always uses the oldest of the dates * * *.

Here, the oldest date on the label reflected the manufacture date rather than the placed-in-service date. The sample also included items that were not yet placed in service and items that were withdrawn from service. In any event, even if the sample that was taken were valid and the conclusions could be relied on, the expert's conclusions as to the median physical age of the garments and dust control items do not support the useful lives determined by respondent that would require petitioner to depreciate the items over either 3 years or 5 years. Rather, the conclusions would be supportive of and more consistent with petitioner's approximations.

Respondent asserts that the replacement clause in petitioner's Service Rental Agreement is evidence that petitioner estimated the average useful life to be 50 months. The replacement provision in the Service Rental Agreement is not determinative of the useful life of the garments and dust control items. We are persuaded that the provision was used by petitioner as an incentive for customers to care for the garments and to prevent customers from misusing the garments and dust control items. Normal wear and tear, however, would reduce the useful life of the garments.

When respondent computed the deficiency amounts, respondent based the useful life of the garments and dust control items on the length of the service contract, which was 3 years for industrial garments and 5 years for clean room garments. The length of the term of the service contract is not a good indication of the useful life of the garments and dust control items, because the contract had a provision for the replacement of items and the length of the agreement could be changed in negotiations. See Ames v. Commissioner, supra (the useful life of leasehold improvements was the estimated life without regard to the length of the lease term).

We conclude that petitioner has shown that its approximation of the useful life of the garments and dust control items was reasonable and was based on a reasonable relationship to its

business practices.  Petitioner's treatment of the garments and dust control items as consumable materials and supplies and petitioner's method of deducting the costs of these items in the taxable year that they were placed in service are consistent with the regulations, section 1.162-3, Income Tax Regs.  See sec. 1.466-1(c)(1)(ii)(C), Income Tax Regs.

We also conclude that petitioner has demonstrated that its method of expensing the garments and dust control items when placed in service results in a clear reflection of income under section 446 and section 1.446-1(a)(2), Income Tax Regs.  Several factors influence our decision.

For more than 30 years, petitioner's taxable income was computed under the same method of accounting that petitioner used to compute its income for financial accounting.  See sec. 446(a). Petitioner has also consistently used the same method for tax purposes since 1968, when it changed its method in response to an examination conducted by respondent.  See Rev. Rul. 69-81, 1969-1 C.B. 137 (the deducting of rental items when placed in service is an acceptable method of accounting for Federal income tax purposes where an industrial laundry using the accrual method of accounting is engaged in the rental service of towels, garments, gloves, linens, and business shirts that have a useful life of 12 months or less); see also sec. 446(b); Ansley-Sheppard-Burgess

Co. v. Commissioner, 104 T.C. at 375; sec. 1.446-1(a)(2), Income Tax Regs.; sec. 1.466-1(c)(1)(ii)(C), Income Tax Regs.

According to petitioner's expert report and audited financial statements, petitioner's method is "in all material respects * * * in conformity with generally accepted accounting principles." See sec. 1.466-1(c)(1)(ii)(C), Income Tax Regs.; see also Van Raden v. Commissioner, 71 T.C. 1083, 1104-1105 (1979), affd. 650 F.2d 1046 (9th Cir. 1981); sec. 1.446-1(a)(2), Income Tax Regs. Also according to petitioner's industry experts, petitioner's method is in accordance with the accepted practices in its trade or business. See sec. 1.446-1(a)(2), Income Tax Regs.; see also Molsen v. Commissioner, 85 T.C. 485, 506 (1985); Madison Gas & Elec. Co. v. Commissioner, 72 T.C. 521, 556 (1979), affd. 633 F.2d 512 (7th Cir. 1980); Auburn Packing Co. v. Commissioner, 60 T.C. 794, 799 (1973); Sam W. Emerson Co. v. Commissioner, 37 T.C. 1063, 1068 (1962).

The Commissioner cannot require a taxpayer to change from an accounting method that clearly reflects income to an alternate method of accounting merely because the Commissioner considers the alternate method to reflect income more clearly. Ansley-Sheppard-Burgess v. Commissioner, supra at 371; Molsen v. Commissioner, supra at 498; Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. at 1045; Bay State Gas Co. v. Commissioner, 75 T.C. at 422. Respondent's proposed change to

petitioner's long and consistently used method was based on isolated statements made by petitioner's employees during the course of the audit and was pursued based on puffing on petitioner's Web site.  The statements, however, related to physical life.  The statements were overcome by convincing evidence that the useful lives of the items used in petitioner's business were far less than the useful lives determined by respondent and that the useful lives were reasonably expected to be not substantially in excess of a year.  We conclude that respondent's determination was arbitrary or without a sound basis in fact or law, and, thus, was an abuse of discretion under section 446(b).

We have carefully considered all of the remaining arguments that have been made by the parties for a result contrary to those expressed herein, and, to the extent not discussed above, they are irrelevant or without merit.

To reflect the foregoing and concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>